## WILLIAMS HOLDING GROUP, LLC, Appellant

v.

## BOARD OF SUPERVISORS OF WEST HANOVER TOWNSHIP.

Commonwealth Court of Pennsylvania.

Argued March 10, 2014.

Decided Sept. 17, 2014.

Ronald M. Lucas, Harrisburg, for appellant.

Matthew J. Créme, Jr., Lancaster, for appellee.

BEFORE: DAN PELLEGRINI, President Judge, and P. KEVIN BROBSON, Judge, and JAMES GARDNER COLINS, Senior Judge.

OPINION BY Judge BROBSON.

Appellant Williams Holding Group, LLC (Developer) appeals from an order of the Court of Common Pleas of Dauphin County (trial court). The trial court affirmed the decision of the Board of Supervisors of West Hanover Township (Township), denying Developer's application for approval of a proposed stormwater facility as a con-

ditional use. We reverse the trial court's order.

Developer owns a tract of land of approximately twenty acres in West Hanover Township (Property). The Property is located in the Township's Neighborhood Commercial Zoning District (NC). The Township's Zoning Ordinance (Ordinance) also provides for the establishment of environmental protection overlay districts (EPODs) throughout the Township. There are several varieties of EPODs that may be established under the Ordinance, including stream protection overlay districts (SPODs), hillside and slope protection overlay districts (HSPODs), and wetland protection overlay districts (WPODs). The Ordinance provides for certain uses proposed within the various EPODs as conditional uses. The particular use for which Developer sought conditional use approval is a stormwater facility to be used in conjunction with Developer's proposed development of the Property primarily as a townhouse community.

The proposed stormwater facility consists of the placement of a stormwater conveyance pipe thirty-six inches in diameter within and enclosing an approximate 369-foot[1] length of an unnamed tributary of the Manada Creek. The entire length of this enclosure lies within an SPOD and HSPOD. Essentially what appears to be involved in the proposed conditional use is the enclosure of the waterway/stormwater conveyance and the placement of soil around and above the stormwater pipe such that the area, which is presently essentially a streambed with slopes on both sides, would become a level area with an embedded stream/stormwater conveyance pipe running under a roadway and/or driveways within the proposed develop-

ment for the above-described distance. Thus, if Developer were permitted to construct the stormwater facility, the construction would eliminate part of the SPOD and HSPOD in that area. As discussed below in fuller detail, this result lies at the heart of the Board's decision to deny Developer's request for conditional use approval.

## I. RELEVANT PROVISIONS OF THE ORDINANCE

Section 195–78 of the Ordinance sets forth the following general purposes of EPODs:

A. To protect drainageways and streams from development impacts.

B. To minimize negative impacts from development on hillside and slope areas.

C. To protect water features from development impacts.

D. To preserve prime agricultural soils.

E. To protect existing wooded areas.

F. To minimize wetland impacts.

G. To preserve water quality.

H. To enhance water infiltration.

The Ordinance provides the following narrative comment regarding SPODs:

The Comprehensive Plan identifies and recognizes streams and the natural areas around them as important hydrological and environmental assets. It is the intent of this section to provide appropriate standards for delineating and preserving natural and man-made waterways. These regulations are provided to protect wildlife; reduce exposure to high water and flood hazards; preserve existing vegetation along waterways;

1. The Board found that the length of the enclosure is approximately 327 feet, but, we note, Developer in its brief states that the length of the enclosure is 369 feet. (Developer's Br. at 9.)

minimize the negative effects on water-ways from agricultural and development related erosion; minimize scenic degradation; and protect water quality by reducing and cleaning stormwater runoff.

Section 195–79 of the Ordinance. The Ordinance also provides the following narrative regarding HSPODs:

The Comprehensive Plan recognizes steep slopes and hillsides as unique areas. Slope areas are fragile and susceptible to erosion, landslides, mudslides, degradation of their natural vegetation and increased flooding using conventional development practices. It is the intent of this section to provide reasonable standards for hillside development that guide development away from steep areas; minimize grading and other site preparation in steep areas; provide safe means for ingress and egress while minimizing scarring from hillside construction; preserve the natural conditions in steep areas; and prevent flooding and the deteriorating effects of erosion to streams and drainage areas.

Section 195–80 of the Ordinance. Although it cannot be said that these general provisions are solely aimed at avoiding the environmental harms that often result from unchecked construction in areas where the natural tendency of water is to find the closest point to sea level, it is clear from a review of the provisions that the primary goal of the SPOD language is to preserve waterways. As to the HSPOD language, the entire paragraph refers almost entirely to concerns that arise from flooding, erosion, landslides, and was also

adopted specifically to "prevent flooding and the deteriorating effects of erosions to streams and drainage areas," as stated in the last sentence. Thus, the harms that this language apparently seeks to avoid center on potential damage to waterways. In this case, although the proposed construction will enclose the waterway for a certain distance, there appears to be no dispute that the waterway will continue as before and will discharge into the Manada Creek.

Both the SPOD and HSPOD Ordinance provisions permit essentially the same permitted uses and conditional uses. The common permitted uses are:[2]

(1) Agricultural uses, such as general farming, pasture grazing, outdoor plant nurseries, horticulture, truck farming, no-till planting and wild crop harvesting.

(2) Common open space.

(3) Educational or scientific use not involving buildings or structures.

. . . .

(4/5) Trail access to the stream or drainageway and trails in linear parks.

(5/6) Passive recreational areas not involving structures.

(7) Accessory residential uses, such as gardens, play areas or fences.

(7/8) Wildlife preserves.

Section 195–79(C)(1)–(8) of the Ordinance[3] (relating to SPODs) and Section 195–80(B)(1)–(8) of the Ordinance (relating to HSPODs).

The conditional uses allowed in SPODs and HSPODs are also essentially identical:[4]

---

**2.** Where the parenthetical subdivisions include two number references, the numbering difference reflects slight distinctions between the SPOD and HSPOD provisions.

**3.** This section contains an additional permitted use pertinent only to SPODs—"[f]ishing,

swimming, boating and hunting." Section 195–79(C)(4) of the Ordinance.

**4.** The numbering in these subsections of the SPOD and HSPOD is also slightly different as walking bridges are not a conditional use in

(1) Accessory commercial uses, such as picnic areas or fences.

(2) Underground public utilities.

(3) Walking bridges

(4) Footpaths.

(4/5) Driveway crossings.

(5/6) *Any other use requiring a federal or state encroachment permit.*

Section 195–79(D)(1)–(6) of the Ordinance (relating to SPODs) and Section 195–80(C)(1)–(5) of the Ordinance (relating to HSPODs) (emphasis added). The conditional use at issue in this matter, which is allowed in both SPODs and HSPODs, is "[a]ny other use requiring a federal or state encroachment permit." *Id.*

We quote below the two provisions of the Ordinance that were of primary significance to the Board's and the trial court's decisions. The first provision we quote is relevant solely in HSPODs and relates to "land removal" in such districts. The second provision is from the article of the Ordinance pertaining to conditional uses in EPODs.

Section 195–80(E) of the Ordinance, the provision specifically applicable to HSPODs, provides:

> Up to ¼ of the land with slopes greater than 25%, as defined by § 195–72A, may be removed or altered only when such slopes are isolated, small or otherwise occur as knolls which do not adversely affect the design of the plan or open space subdivisions or land developments.

Section 195–182(A)(1) of the Ordinance, contained within the general conditional use provision applicable to EPODs, provides:

> Any construction within any EPOD shall be minimally invasive and utilize best management practices, as defined by [the Pennsylvania Department of Envi-

ronmental Protection (DEP)] and [the United States Army Corps of Engineers (COE)].

For the purpose of providing context for review of the entire conditional use provisions, we note that Section 195–182(H) of the Ordinance provides additional guidance relating to "[c]ommunity improvements, such as stormwater facilities and roadways:"

> (1) Where practicable, crossings of EPODs shall be located in areas of minimal width of EPOD.

> (2) All roadway crossings of EPODs shall incorporate pedestrian sidewalks and curbs into the design.

> (3) All other roadway design requirements in Ch. 173, Subdivision and Land Development, shall apply.

> (4) Guide rails or fences shall be incorporated in the areas of actual encroachment into the EPOD.

> (5) Any areas of fill associated with a stormwater facility shall be located outside of the EPOD.

> (6) Stormwater outlet design shall be done in such a manner as to minimize any impact on the EPOD.

The Ordinance also provides that the identification and establishment of EPODs occurs at the time of subdivision or land development, or when a property owner seeks a zoning permit. *See* Section 195–79(E)(1) of the Ordinance (relating to SPODs); Section 195–80(D)(1) of the Ordinance (relating to HSPODs) ("The [SPOD/HSPOD] shall be established at the time of subdivision or land development or the application for a zoning permit"). Although the Ordinance does not specifically provide that a developer or applicant has the responsibility to affirmatively identify and "establish" an EPOD, the Ordinance

HSPODs and footpaths are not a conditional use in SPODs for obvious reasons.

certainly suggests that the initial responsibility rests with an applicant, presumably subject to review and acceptance by the Township or its zoning officer (in the case of a zoning permit) of the EPODs suggested by an applicant.

## II. DEVELOPER'S APPLICATION AND THE BOARD'S PROCEEDING

### A. The Application

Developer submitted an initial application for conditional use on January 5, 2012, and later submitted a revised conditional use application dated January 31, 2012, including plans. (Reproduced Record (R.R.) at 103a (initial application) and 118a (hereafter the Application).) The Application identified the name of the proposed development as "Creekvale." The Application indicated that Developer was seeking conditional use approval for a stormwater collection and conveyance system pursuant to an encroachment permit DEP had issued, and which called for consideration under the SPOD, HSPOD, WPOD, and conditional use provisions of the Ordinance. (R.R. at 118a.)

In the narrative section of the Application, Developer first noted that it had submitted in 2007 and had obtained preliminary subdivision approval for a different development named "Olde Towne." (Id.) The narrative provides that Developer was proposing an alternative development project for the Property, Creekvale a townhouse development. (Id.) Developer's narrative references the various EPODs it apparently "established" or identified in its graphic plan. (Id.) The narrative provides that Developer applied for a permit from DEP to construct the proposed stormwa-

ter conveyance pipe, inlets, and a discharge within the noted EPODs where the pipe is proposed to be placed.[5] (Id.)

Developer's narrative refers to the conditional uses permitted under Section 195–79(D)(6) of the Ordinance for the identified SPOD based upon the requirement that Developer obtain, and in fact, did obtain state and federal encroachment permits. Developer explained in the Application:

> The SPOD consists of a land strip on each side of a watercourse. A watercourse is defined by the Zoning Ordinance as a "channel or conveyance of surface water, such as a stream ... having defined beds and banks, whether natural or artificial, with perennial or intermittent flow." The minimum width of the SPOD is 50 feet on either side of the watercourse. [Developer] has applied for a permit from DEP to place a portion of the existing watercourse within a pipe, so as to convey any storm water under the future driveway area in the Creekvale Plan. Once the pipe is constructed, this segment of the SPOD will be eliminated, as it will no longer meet the Zoning Ordinance definition of "watercourse." Under the approved Olde Towne ... Plan, this channel would have been eliminated within this area. The DEP permit will also provide for a storm discharge pipe within the SPOD at the southwestern corner of the site. . . .

(R.R. at 120a.)

With regard to the conditional use proposed within the identified HSPOD, Developer provided the following comments:

> The HSPOD consists of all land which has a slope of 25% or more. [Developer]'s Creekvale Plan provides for ... the

---

5. As indicated in the narrative, the plans depict EPODs in various areas of the Property, but the conditional use application at issue involves only an area in the southern portion of the Property.

storm sewer pipe and inlet encroachments into the HSPOD along the southern portion of the site. As [Developer] has applied for a permit from DEP to construct the encroachments within [the] HSPOD [on the southern part of the Property], it is entitled to a conditional use for [that] storm water facilit[y]. Moreover, the DEP approved encroachments within the HSPOD along the southern portion of the site will result in the removal of all natural slopes of 25% or more in that area.

(*Id.*) As to the WPODs in the southern portion of the Property, Developer provided the following narrative support:

The WPOD consists of lands within 50 feet of a nontidal wetland or mitigated wetland within the Township. While [Developer]'s Creekvale avoids removal of any defined wetlands on the Property, portions of the proposed storm sewer pipe and inlets are located within the 50 foot WPODs along the southern portions of the site. *See* **Exhibit 2 (as revised).** Additionally, the storm discharge pipes at the southern corner ... are also located within defined WPODs. As [Developer] has applied for a permit from DEP to construct the encroachments within these WPODs, it is entitled to a conditional use for these storm water facilities. The underlying wetlands will not be altered in any way, and areas within 50 feet of those wetlands will continue to be subject to WPOD regula-

tions after the encroachments are constructed.

(*Id.*)

## B. The Board's Hearing and Decision

### 1. The Hearing

On March 5, 2012, the Board conducted a hearing on the Application. Developer presented two witnesses, Robert J. Fisher, a professional engineer and land surveyor, who presented a report and responded to questions from Board members, and Andrew S. Williams, who is one of Developer's corporate members. Although several Township residents provided comments in opposition to the Application, no person or entity entered an appearance seeking to intervene in opposition to the Application.[6]

Before Developer presented its witnesses, the Board requested the Township Zoning Officer (ZO) to provide a description of the land development project, Creekvale, and Developer's application. The ZO stated that "[t]he question tonight really becomes whether ... the state or federal permit allows [Developer] to fill over the pipe in what still, in my opinion, is the environmental protected overlay district." (R.R. at 13a–14a.) The ZO opined that Developer anticipated approval of its application based solely on its obtaining the federal and state encroachment permits, but that, in his opinion, because the EPODs are established before the submission to the state and federal authorities, such permits permitted Developer only "to

---

6. We note here that Section 913.2 of the Municipalities Planning Code (MPC), Act of July 31, 1968, added by the Act of December 21, 1988, P.L. 1329, *as amended*, 53 P.S. § 10913.2, authorizes governing bodies to appoint a hearing officer for the purpose of adjudicating a request for a conditional use permit. This power enables a governing body to participate in such a proceeding as a party in opposition to a conditional use application. In such circumstances, the governing body, as

an intervening party, may enter into a negotiated settlement with an applicant that includes conditions in addition to those contained in a zoning ordinance. *In re Drumore Crossings*, 984 A.2d 589, 597–98 (Pa.Cmwlth. 2009), *appeal denied*, 607 Pa. 705, 4 A.3d 1054 (2010). The Board did not elect to proceed as an intervening objector, nor did any other party intervene as an objector. Thus, Developer was the only party to submit evidence in this matter.

work in an [EPOD].... So the question becomes what do you do with the remaining land." (R.R. at 14a.) The ZO opined that the question before the Board was whether the state and federal permits "negate[d] the local ordinances." (R.R. at 15a.) The ZO also pointed out to the Board that the encroachment permits specifically provide that, notwithstanding the issuance of such permits, "all other local law and ordinances must be followed." (Id.) In the ZO's view, that language indicated "that the encroachment permit is exactly for an encroachment and then get the heck out, restore it as best you can to the way it was and proceed from there." (R.R. at 16a.)

Counsel for Developer disagreed with the ZO's interpretation of the Ordinance, opining that "[t]he ordinance authorizes that if you get a state permit, you're—you get a conditional use approval for that state permit, then you're authorized to do the work that the permit allows you to do. The permit allows us to put in a pipe for an intermittent stream, a ditch or a swale." (R.R. at 20a–21a.) In response to a question posed by the Board's Chairman, counsel for Developer stated that the permit authorized Developer to cover the pipe: "You can't just leave a pipe there. You have to cover it." (R.R. at 21a.) Counsel for Developer stated that the permit would not authorize the construction of buildings above the filled-over pipe, but that Developer planned to place paved surfaces over the covered-pipe area, and that once the work permitted by the state and federal encroachment plans was complete, "there is no environmental protection overlay district there remaining." (Id.)

### 2. The Board's Decision

The Board acknowledged that, on January 31, 2012, Developer obtained from DEP a water obstruction and encroachment permit for the stormwater convey-ance pipe and related work. (Finding of Fact (F.F.) no. 9.) The Board also found that Developer received a letter from COE dated February 6, 2012, authorizing Developer to discharge clean fill below the ordinary high water mark, outside of wetlands. The Board emphasized in its findings relating to DEP's and COE's authorizations that both of those permits also provided that, notwithstanding the issuance of such permission, Developer was required to comply with other state, federal, and local laws. (F.F. nos. 9, 10.) The Board quoted Section 195–78 of the Ordinance, which sets forth various policy concerns relating to the natural features of the Township, including streams, wetlands, and watershed, and three purposes underlying the Ordinance, including protection of drainageways and streams from development impacts, minimization of development on hillside and slope areas, and protection of water features from development impact. (F.F. no. 11.)

The Board also relied upon Section 195–80 of the Ordinance, which indicates that a purpose of the HSPOD provisions is to "provide reasonable standards for hillside development that guide development away from steep areas and minimize grading and other site preparation and steep slope areas." (F.F. no. 13.) The Board further noted that Section 195–80(D)(4) of the Ordinance, as quoted above, provides for the removal of up to one-quarter "of the land with steep slopes greater than" twenty-five percent. (Id.) The Board also referenced Section 195–79(E)(3) of the Ordinance's SPOD provisions, which requires applicants for zoning permits to include drawings with measurements and Section 195–80(D)(3) of the HSPOD provisions, which requires zoning permit applications to include drawings showing locations of HSPODs by metes and bounds. (F.F. nos. 14, 15.) The final provision the Board

cited is Section 195–182 of the Ordinance, which as indicated in the quote above, requires that "any construction within any EPOD shall be minimally invasive and utilize best management practices, as defined by DEP and USCOE." (F.F. no. 16.)

The Board perceived Developer's argument as suggesting that the permits Developer received from DEP and COE preempted the application of other Ordinance provisions. The Board, citing the language of the permits, concluded that the issuance of the permits did not constitute a per se approval under the Ordinance of the proposed stormwater facility use on the identified SPODs and HSPODs in the southern portion of the Property. Rather, the Board concluded that if the Ordinance contains standards that are more stringent than those reflected in the permits, the Board may deny conditional use approval based upon the failure of a developer to meet those standards. The Board concluded that the proposed use, by eliminating the slopes entirely, would violate the provision of the HSPOD regulations authorizing only the removal of one-quarter of the land containing steep slopes. The Board reasoned that the use of fill over the conveyance pipe would be "far beyond minimally invasive [and] destroy all of the EPODs for which the conditional uses are requested." (Board's Decision, Reasoning Section, para. 3.) The Board also observed that "[n]one of the conditional uses for these EPODs would be necessary if [Developer] was not attempting to make the maximum use of [the Property] by minimizing or eliminating these sensitive environmental areas, and it could make reasonable use of [the Property] without the conditional uses requested." (Id.) The Board also concluded that Developer was not entitled to the conditional uses it requested because the Application did not include metes and bounds in the description of the EPODs. (Id. para. 2.)

## III. TRIAL COURT'S ORDER

Developer appealed from the Board's order to the trial court. The trial court, without accepting additional evidence, affirmed the Board's decision. Deferring to the Board's interpretation of the Ordinance, the trial court concluded that the Board reasonably interpreted Ordinance Section 195–182(A)(1)'s requirement that "construction be minimally invasive." The trial court concurred with the Board's reasoning that the complete elimination of an EPOD could not be characterized as "minimally invasive." The trial court also agreed with the Board's conclusion that the uses contemplated in the Application failed to comply with the limitation-of-land-removal provision, Section 195–80(E) of the Ordinance.[7]

## IV. ANALYSIS

■ Developer now appeals from the trial court's order,[8] raising the following issues for our review: (1) whether the Board and trial court erred in concluding

7. The trial court, however, agreed with Developer's argument that it did not have to provide metes and bounds measurements with the Application, because such information is only required at the subdivision and land development approval phase of the development process.

8. This Court's review of a trial court's order affirming a governing body's denial of conditional use applications, where the trial court takes no additional evidence, is limited to considering whether the governing body, in this case, the Board, erred as a matter of law or abused its discretion. *Herr v. Lancaster Cnty. Planning Comm'n*, 155 Pa.Cmwlth. 379, 625 A.2d 164, 167 (1993), *appeal denied*, 538 Pa. 677, 649 A.2d 677 (1994). A governing body abuses its discretion when its necessary findings of fact are not supported by substantial evidence. *Id.*

that Developer did not satisfy its burden to demonstrate that its proposed stormwater facilities complied with all specific and objective criteria contained in the Ordinance; (2) if the effect of the proposed stormwater facility on the public health, safety, and welfare is a relevant consideration in evaluating the Application for the conditional uses, whether the record lacks evidence to support such findings; and (3) where the Ordinance provision that requires *construction* in EPODs to be "minimally invasive" and to be accomplished through "best management practices, as defined by [DEP] and [COE]," whether the Board and trial court erred in concluding that the proposed *use* violates this provision when the use, if permitted, will completely eliminate the EPODs at issue.

### A. The Relevant Law Relating to Conditional Uses

 As we held in *In re Thompson,* 896 A.2d 659 (Pa.Cmwlth.2006), *appeal denied,* 591 Pa. 669, 916 A.2d 636 (2007), "[a] conditional use is nothing more than a special exception which falls within the jurisdiction of the municipal governing body rather than the zoning hearing board." *Thompson,* 896 A.2d at 670. Just like special exceptions, a conditional use is not an exception to a municipality's zoning ordinance, "but rather a use to which [an] applicant is entitled provided the specific standards enumerated in the ordinance for the [conditional use] are met by the applicant." *Id.* (citations omitted). In recognition of the similarity between special exceptions and conditional uses, courts apply the same standards of proof to both types of applications. *Id.*

 The applicable standard of proof requires an applicant to demonstrate that the use proposed in an application complies with the specific criteria of the particular ordinance. *Id.* An applicant who sat-

isfies this prima facie burden is entitled to approval, unless objectors in the proceeding offer credible and sufficient evidence indicating that the proposed use would have a detrimental impact on public health, safety, and welfare. *Id.* In referring to "specific" criteria in a conditional use provision, we have observed that "[s]pecificity is the essential characteristic of operative [conditional use] requirements in an ordinance. The Pennsylvania Supreme Court has long defined a special exception as one allowable where requirements and conditions *detailed* in the ordinance are found to exist." *Bray v. Zoning Bd. of Adjustment,* 48 Pa.Cmwlth. 523, 410 A.2d 909, 911 (1980) (emphasis in original). We further held:

> [W]hen municipalities have put general, non-specific or non-objective requirements into the ordinance with respect to special exceptions, our decisions have usually not seen such general provisions as part of the threshold persuasion burden and presentation duty of the applicant. Judge Kramer stated the reason in *In re: Appeal of George Baker,* 19 Pa.Cmwlth. 163, 339 A.2d 131, 135 (1975) as follows:
>
>> It is in the nature of a special exception to require that the applicant meet *reasonably definite conditions, and it would be manifestly unfair to require him to prove conformity with a policy statement, the precise meaning of which is supposed to be reflected in specific requirements* ... Any other view would enable the [board] to assume the legislative role....

*Bray,* 410 A.2d at 911 (emphasis added). We summarized the various burdens as follows:

> [A]s to specific requirements of the zoning ordinance, the applicant has the persuasion burden, as well as the initial evidence presentation burden. The ob-

jectors have the initial evidence presentation duty with respect to the general matter of detriment to health, safety and general welfare, even if the ordinance has expressly placed the persuasion burden upon the applicant, where it remains if detriment is identified.... *Where the ordinance attempts to place upon the applicant a burden of proof even more vague in its nature, we have refused to give it effect.*

*Id.* at 912 (emphasis added). Thus, if a requirement is interpreted as one upon which the burden is placed on an applicant, but the requirement is nonobjective or too vague to afford the applicant knowledge of the means by which to comply, the requirement is either one that is not enforceable (see quoted language above), or, if it relates to public detriment, the burden shifts to an objector, who must demonstrate that the applicant's proposed use would constitute such a detriment.

■ Thus, a key element in evaluating conditional use decisions by a governing body is whether requirements contained in the zoning ordinance are specific and objective or vague and subjective. In the case of the latter, a requirement may be either one that may not be enforced or one for which an applicant bears no initial evidentiary burden. In evaluating the nature of a requirement, the clear cut example of a proper, objective requirement is a buffer requirement, such as in *Thompson,* where the conditional use provisions of the ordinance required that stormwater basins be located at least fifty feet from the defined edge of a watercourse. *Thompson,* 896 A.2d at 673.

■ We also note the rules governing our appellate review and the rules of ordinance interpretation under Section 603.1 of the MPC.[9] First, we note the common rule

that appellate courts reviewing a governing body's adjudication of a conditional use application generally should defer to the interpretation rendered by the governing body. *See Smith v. Zoning Hearing Bd.,* 734 A.2d 55, 57 (Pa.Cmwlth.), *appeal denied,* 561 Pa. 664, 747 A.2d 904 (1999). "[A]s the entity charged with administering a zoning ordinance," the governing body possesses knowledge and expertise regarding the ordinance. *Id.* at 58. This rule must sometimes bend to the second rule, found in Section 603.1 of the MPC, which provides:

[i]n interpreting the language of the zoning ordinance to determine the extent of the restriction upon ... the use of the property, the language shall be interpreted, where doubt exists as to the intended meaning of the language written and enacted by the governing body, in favor of the property owner and against any implied extension of the restriction.

We have held that we must "interpret ambiguous language in an ordinance in favor of the property owner and against any implied extension of the restriction." *Isaacs v. Wilkes–Barre City Zoning Hearing Bd.,* 148 Pa.Cmwlth. 578, 612 A.2d 559, 561 (1992). Thus, the general rule contained in Section 603.1 of the MPC applies only when the words of an ordinance are not free and clear from ambiguity. *Id.*

### B. The Merits of Developer's Application

■ The conditional uses permitted in SPODs and HSPODs include any use that requires an encroachment permit from a state or federal authority. The Township does not dispute Developer's contention that the proposed conditional use required encroachment permits from DOE and COE. Thus, because the proposed conditional uses—*i.e.,* the stormwater facili-

9. Added by the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10603.1.

ties—required federal and state encroachment permits, they are *per se* permitted conditional uses under the SPOD and HSPOD provisions of the Ordinance. Thus, we must consider whether Developer is correct in asserting that the issuance of permits by DEP and COE is sufficient to demonstrate that Developer complied with all requirements of the Ordinance for conditional use approval for the proposed stormwater facilities.

As suggested above, the Board based its decision to deny the Application on two provisions of the Ordinance, Section 195–80(E) and Section 195–182(A)(1) of the Ordinance. With regard to both provisions, the Board concluded that they constituted objective criteria with which Developer failed to comply. Developer argues that the provisions are either ambiguous or nonobjective. As to Section 195–80(E), relating to land removal, Developer asserts that the Board should have interpreted the ambiguous provision in favor of Developer, in accordance with Section 603.1 of the MPC. Developer also argues that its receipt of the encroachment permits from DOE and COE satisfied the "minimally invasive" language contained in Section 195–182(A)(1) of the Ordinance. Developer contends that, even if its suggested interpretation of the Ordinance is incorrect, the provision constitutes a subjective requirement. Thus, Developer argues that an *objector* would bear the burden to demonstrate that the proposed use would be detrimental to the health, safety, and welfare of the public. Developer reasons that no objector participated in the proceeding, and, therefore, the record is insufficient to support a denial on the basis of the "minimally invasive" requirement in Section 195–182(A)(1) of the Ordinance.

### 1. The "Land Removal" Provision of the Ordinance

Section 195–80(E) of the Ordinance provides:

Up to ¼ of the land with slopes greater than 25%, as defined by § 195–72A, may be removed or altered only when such slopes are isolated, small or otherwise occur as knolls which do not adversely affect the design of the plan or open space subdivisions or land development.

The Board, while quoting this entire provision, nevertheless addressed in its decision only the first part of the provision: "Up to ¼ of the land with slopes greater than 25% ... may be removed or altered." The Board completely ignored the latter part of the provision. We find the entirety of the provision incomprehensible.

The latter phrase of this provision first limits removal or alteration to isolated or small slopes or those that "occur as knolls," and it then qualifies that limitation by a reference to an ambiguous subset that "[does] not adversely affect the design or open space subdivisions or land development." The ambiguity of this provision is exacerbated by the fact that the term "land" is nowhere defined. Moreover, in addition to limiting the "removal" of "land" by a vague nonobjective standard, the provision does not clearly articulate what alteration of "land" is permitted and what alteration is prohibited.

 Although the provision contains language that appears to contain quantifiable criteria that would normally seem objective, the provision is so vague as to render an applicant's burden to comply impossible because of the ambiguities. Because of the ambiguity, we must construe the provision in favor of Developer. Doing so, we conclude that the proposed alterations do not violate the requirements of the land removal provision.

Although it is undisputed that Developer is proposing to alter the area around the

slopes such that the slopes no longer constitute HSPODs, the work Developer is proposing is an additive process, rather than the reductive process addressed by the Ordinance. Thus, we do not interpret this ambiguous provision to apply to the proposed use. Further, although the Ordinance also limits alterations of steep slopes to one-quarter of the "land," as we discussed above, the provision is so lacking in clarity as to make compliance impossible. Thus, even if we regard Developer's proposal as an "alteration" of land rather than "removal" of land, Developer is entitled to a liberal interpretation of the provision.

Based upon this conclusion, we find that Developer was simply not required to demonstrate compliance with this provision of the Ordinance. *Bray*. Rather, the burden to prove noncompliance would have rested with an objector, if one had elected to become a participant. *Id.* Because no objector participated, there is no evidence to support the Board's conclusion that Developer is not entitled to conditional use approval based upon its alleged noncompliance with this provision. Accordingly, we reject the Board's and the trial court's conclusion that Developer failed to satisfy a burden with regard to Section 195–80(E) of the Ordinance.

### 2. The "Minimally Invasive" Requirement of the Ordinance

Section 195–182(A)(1) of the Ordinance provides:

> Any *construction* within any EPOD shall be minimally invasive and use best management practices, as defined by [DEP] and [COE].

(Emphasis added.) Developer contends that the Board erred in its interpretation of this provision of the Ordinance by concluding that the proposed use, by eliminating the steep slopes in the southern area of the Property, would destroy those affected EPODs, and, thus, could not be regarded as "minimally invasive." Developer contends that the final phrase of this provision "as defined by [DEP] and [COE]," modifies not just the immediately preceding noun "management practices," but also the phrase at issue, "minimally invasive," which modifies the subject of the sentence, "construction." Thus, Developer contends, the "construction" must be "minimally invasive ... as defined by [DEP] and [COE]" and the "construction" also must use "best management practices as defined by [DEP] and [COE]." As will be discussed below, we conclude that the Board has overlooked an aspect of this provision, which we find to be significant. As noted above, the provision addresses *construction*, not *uses*, and, thus, we view the focus of the provision to be not whether a *use* has a minimally invasive effect on EPODs, but rather whether the *construction* of the use is performed in a manner that is minimally invasive. Thus, we view this provision as relating to the manner in which construction is performed, rather than as a standard or requirement relative to Developer's initial burden regarding its proposed *use*, regardless of whether the requirement is viewed as objective or subjective.

Moreover, in light of the rules governing the interpretation of local ordinances, as we discussed above in relation to the "land removal" provision, this Ordinance provision is ambiguous. The Ordinance references a term, "best management practices," that clearly relates to the manner by which construction should be performed. The provision, however, by lacking definitions of the key term—minimally invasive, places an unfair burden on developers who have no way to know whether a proposal will be "minimally invasive" in the eyes of the adjudicator.

The question that arises is: What is the benchmark by which an applicant can determine whether construction is "minimally invasive?" The provision contains no point of reference from which to answer the question of what constitutes construction that is "minimally invasive." In this case, Developer's proposal will eliminate an area of an SPOD and HSPOD on the Property. The proposal, however, will not affect all SPODs and HSPODs on the Property, or even all of the SPOD and HSPOD in the area at issue. Furthermore, as discussed below, the proposal completely avoids affecting a WPOD in the southern area. Does the term "minimally invasive" apply to each discretely identified EPOD or does it apply such that construction will be deemed to be minimally invasive if the proposed construction only affects some or parts of all the EPODs in a given tract of land? As we observed above, although the general rule is that courts should defer to a governing body's interpretation of its own ordinances, *Smith*, where a provision is ambiguous, Section 603.1 of the MPC directs courts to interpret such provisions in a manner that provides for the liberal use of an applicant's property.

Developer contends that DEP's review of Developer's encroachment applications already reflects the concern expressed in the Ordinance for minimization of impacts on protected areas. Developer points out that the encroachment applications require developers to submit information such as stormwater management analysis, floodplain management analysis risk, risk assessments, an alternative analysis, and a mitigation plan. (Developer's Br. at 21.) Further, Developer asserts that DEP's instructions for encroachment permit applications define the term "mitigation" to mean action that " 'avoid[s] and minimize[s] impacts by limiting the degree or magnitude of the action and its implemen-

tation.' 25 Pa.Code § 105.1." (Developer's Br. at 21–22.) Developer thus contends that DEP's review constitutes a per se demonstration of compliance with the requirement in the Ordinance that construction is "minimally invasive."

We cannot definitively agree with Developer's contention that compliance with DEP's standards for mitigating or minimizing the effects of its construction process constitutes absolute compliance with the Ordinance provision calling for construction that is "minimally invasive." In addition to the reasoning above, however, other reasons exist for rejecting the Board's conclusion that Developer's alleged failure to comply with this provision supported the Board's decision to deny the conditional use application.

First, we agree with Developer that the provision is a subjective provision, and, thus, an *objector* would bear the burden to present evidence that the construction has an impact beyond what is normally associated with this conditional use. As this Court summarized in *Bray*, there are three distinct types of standards that may be at issue in a conditional use application proceeding:

> The principles developed are not as complicated as they may sound upon recitation. In outline form, the rules concerning initial evidence presentation duty (duty) and persuasion burden (burden) in [conditional use] cases may be restated as follows:
>
> [1.] *Specific requirements, e.g., categorical definition of the [conditional use] as a use or other matter, and objective standards* governing such matter as a [conditional use] and generally:
>
> The applicant has both the duty and the burden.

[2.] General detrimental effect, *e.g.,* to the health, safety and welfare of the neighborhood:

Objectors have both the duty and the burden; the ordinance terms can place the burden on the applicant but cannot shift the duty ...

[3.] General policy concern, *e.g.,* as to harmony with the spirit, intent or purpose of the ordinance:

Objectors have both the duty and the burden; the ordinance terms cannot place the burden on the applicant or shift the duty to the applicant....

*Bray,* 410 A.2d at 912–13. We further explained the requirement that an applicant bears the burden of both persuasion and initial duty to present evidence "to show that the proposal complies with the 'terms of the ordinance' which expressly govern such a grant:"

This rule means the applicant must bring the proposal within the specific requirements expressed in the ordinance for the use (or area, bulk, parking or other approval) sought as a [conditional use]. Those specific requirements, standards or "conditions" can be classified as follows:

1. The kind of use (or area, bulk, parking or other approval)—*i.e.,* the threshold definition of what is authorized as a [conditional use];

2. Specific requirements or standards applicable to the [conditional use]—*e.g.,* special setbacks, size limitations; and

3. Specific requirements applicable to such kind of use even when not a [conditional use]—*e.g.,* setback limits or size maximums or parking requirements applicable to that type of use whenever allowed, as a permitted use or otherwise.

*Bray,* 410 A.2d at 911. As we observed already, the term "minimally invasive" is not defined, and contains no definitive guidelines. A developer thus has no means of knowing *how* to comply affirmatively with the requirement. The objective and specific standards provided as examples above contain definitive measures with which a developer can demonstrate compliance and leave no room for doubt when a developer submits an application.

We note that this Court has evaluated gray areas where a particular requirement contains both objective and subjective characteristics. By way of example, in *Marquise Investment, Inc. v. City of Pittsburgh,* 11 A.3d 607 (Pa.Cmwlth.2010), *appeal denied,* 612 Pa. 694, 29 A.3d 799 (2011), this Court was required to determine whether certain standards applicable to a conditional use application were general or specific, and where the consequential evidentiary burdens fell. The questioned standards in that case provided for approval of a proposed conditional use if the governing body determined the application complied with several "general criteria." *Marquise Investment,* 11 A.3d at 612–13. Some of the standards in the ordinance related to visual impacts, hours of operation, service, loading, and other on-site operations, which the ordinance at issue specifically addressed by providing concrete requirements, and the Court held that the applicant had the burden of proof and persuasion on those matters.

One operational requirement, however, mandated that an applicant had a burden to demonstrate compliance by showing "consideration of adjacent and surrounding land uses which may have differing sensitivities to such operational impacts." *Id.* at 614. The Court did not clearly opine regarding whether this last standard was one that was objective and specific, but rather implicitly held that the condition was a general one for which the City and/or objectors bore an evidentiary bur-

den that they failed to satisfy. Specifically, the Court observed that the City was required to present evidence rebutting the presumption the applicant had earned based upon its demonstrated compliance with the specific criteria of the ordinance. The Court agreed that the objecting City had a burden to demonstrate that there was a high probability that the proposed use would adversely affect the public welfare in a way not normally expected from the type of use that was proposed.

■ In this case, as we stated above, Developer demonstrated that its proposed use is one that qualifies as a conditional use because it falls within one such identified conditional use—it required DEP and COE permitting. Although the "minimally invasive" provision at issue in this case is not couched in terms of detrimental impact, we view the apparent purpose of the provision, like the provision addressed by the Court in *Marquise,* to be aimed at avoiding a detriment of some kind. Thus, we believe that Developer did not bear an evidentiary burden to establish that the construction would be minimally invasive. Rather, an objector (such as the Board if it had elected to appoint a hearing examiner and participated as an objecting intervenor or an aggrieved adjoining property owner), would have had to offer some evidence relative to the question of whether the Application proposed construction that was more than "minimally invasive." The record does not contain such evidence, and, therefore, is insufficient to support the Board's findings and conclusions regarding this requirement.

■ Additionally, even if the provision is considered an objective one and Developer bore an initial burden to demonstrate that its proposal satisfied the standard, we conclude that Developer did satisfy its initial burden to prove compliance. Developer submitted the permit approvals granted by DEP and COE. As suggested by Developer, those permits require a demonstration to state and federal authorities that the proposed *construction* will be accomplished with minimal detrimental impact. The approval, thus, provided some evidence that the construction would have the least harmful impact on the protected streambed area. Furthermore, Developer offered the testimony of its engineering expert, Robert Fisher, who testified regarding the process of developing the stormwater facilities plan for the purposes of DEP, COE, and Township review and approval. Mr. Fisher testified that the plan "avoided all impacts to the ... wetlands" in the area at issue. (R.R. at 27a, 29a.) Mr. Fisher's testimony described the review process for the encroachment permits as follows: "[W]e kept looking at it, tweaking it, reducing the grading, reducing the impacts, reducing the density on the site until we finally got to the point of the approval here." (R.R. at 30a.) With regard to the approved use of the pipe to enclose the stream, Mr. Fisher testified that the pipe had to be covered over and that DEP's permits had reviewed the impact of the filling and grading required by the enclosed pipe. (R.R. at 36a.) Mr. Fisher testified that DEP's primary concern was that Developer should avoid the wetlands in the area, and that the plan accomplished that objective. (*Id.*) Mr. Fisher testified that when using a pipe with a thirty-six inch diameter, the pipe would typically need to be covered with about six to seven feet of cover, but that the plan called for about twelve feet of cover. (R.R. at 41a.) Thus, Mr. Fisher testified that the plan, at least with regard to the wetlands, reflected the desire of DEP to have no impact on that particular EPOD. The evidence relating to DEP's and COE's review and approval and Mr. Fisher's testimony concerning Developer's

efforts to avoid an impact on one of the EPODs—the WPOD, constitute evidence that supports Developer's assertion that the proposal would be minimally invasive. Given the ambiguity of the provision, if the requirement that construction be minimally invasive is one that is objective, the evidence was sufficient to satisfy Developer's initial burden, and the burden then shifted to an objector to demonstrate that the construction would not be minimally invasive. As we have noted above, the Board is not an intervening objector, and no party offered evidence in opposition to the evidence Developer submitted.

Although it is clear that the proposed work will eliminate EPOD areas on the Property, the underlying policy component to protect EPODs as natural features provides an insufficient basis upon which to conclude that the construction is more than minimally invasive. Also, as discussed above, the primary objective of the EPOD provisions is not to preserve each and every EPOD, but rather to ensure that construction affecting EPODs does not result in harm to local waterways. We reiterate that neither hillsides nor steep slopes are among the "important natural and cultural features" mentioned in Section 195–78 of the Ordinance. Moreover, while Section 195–78 of the Ordinance references hillsides and slopes in describing the goals of the EPOD provisions, those goals make clear that management of development of hillsides and steep slopes is a means to an end, not an end in itself. Thus, Section 195–78 of the Ordinance provides that among the purposes and stan-

dards of the EPOD provisions is the goal to "protect drainageways and streams from development impacts," Section 195–78(A) of the Ordinance, and to "minimize negative impacts *from* development on hillside and slope areas." Section 195–78(B) of the Ordinance. Neither these purposes nor others identified in Section 195–78 of the Ordinance reflects a legislative intent to protect hillsides and slopes solely because they constitute "sensitive natural areas." Rather, these fundamental purposes reflect the fact that the key goal in regulating development on hillsides and slopes is a means to an end. We emphasize that Section 195–78(B) of the Ordinance does not provide that a purpose of the EPOD regulations is to minimize negative impacts *upon or to* hillside and slope development. If the purpose of the ordinance were to minimize negative impacts to or upon hillsides and slopes, the drafters should have used such language.[10]

As suggested, the policies underlying the ordinance are aimed at limiting the effects of unchecked development on hillsides because they often lead to runoff into watercourses and lead to the degradation of water quality downstream. In a case such as this, Developer's plan, as approved by DEP and COE, will preserve the quality of the water, because the waterway will be enclosed for only approximately 369 feet and will continue to discharge into the Manada Creek. The plan also will not affect the SPOD downstream from the proposed stormwater facilities. If the Township intended to preclude proposals

10. For these reasons, we respectfully disagree with the dissent's rationale regarding the minimally invasive provision and its characterization of the proposed work as "complete[ly destroying] sensitive natural areas." We also disagree with the dissent's comments that the Board found that the placement of the pipe would be threatening to remaining environmentally protected areas. We have found no

specific details supporting this comment regarding how or where the installation of the pipe threatens "other" areas. As we discuss above and below, and as reflected in the governmental approvals discussed above, the protection of hillsides and slopes is primarily a means of accomplishing, where necessary, the preeminent goal of protecting waterways and watercourses.

such as this one, it should have either participated in the proceedings and offered evidence to demonstrate that the Application does not comply with the "minimally invasive" provision or drafted the Ordinance in a manner that clearly informs a property owner of specific and objective criteria with which they must comply in order to perform construction in an EPOD area.

Accordingly, we reverse the trial court's order and remand the matter to the trial court with the direction to remand the matter to the Board for the purpose of issuing conditional use permits for the Application.

### ORDER

AND NOW, this 17th day of September, 2014, the order of the Court of Common Pleas of Dauphin County (trial court) is REVERSED. The matter is REMANDED to the trial court. We direct the trial court to remand the matter to the Board of Supervisors of West Hanover Township (Board) and to order the Board to issue the conditional use permits requested in the conditional use application submitted by appellant, Williams Holding Group, LLC.

Jurisdiction relinquished.

DISSENTING OPINION BY Senior Judge JAMES GARDNER COLINS.

I must respectfully dissent from the well-written and scholarly opinion of the majority.

The bulk of the approximately twenty acre Property[1] at issue here is located in the Neighborhood Commercial Zoning District of West Hanover Township. (F.F.¶¶ 1, 4.) On the North and South sides of the Property are pockets of land that also fall within Environmental Protection Overlay Districts. (F.F.¶ 5.) The Environmental Protection Overlay Districts were established as a part of the Township's Comprehensive Plan, which "provided an inventory of important natural and cultural features that include wetlands, floodplains, watersheds, streams, soils, historic sites and buildings." Ordinance § 195–78. In order to preserve and protect the natural and cultural features identified, the Township enacted provisions to its Ordinance to provide "appropriate standards and regulations for the following purposes:"

A. To protect drainageways and streams from development impacts.

B. To minimize negative impacts from development on hillside and slope areas.

C. To protect water features from development impacts.

D. To preserve prime agricultural soils.

E. To protect existing wooded areas.

F. To minimize wetlands impacts.

G. To preserve water quality.

H. To enhance water infiltration.

Ordinance § 195–78(A)–(H). In accordance with the purposes of the Environmental Protection Overlay Districts, the Township adopted subsidiary provisions addressing specific natural and cultural features, including, inter alia: the Stream Protection Overlay District, the Hillside and Slope Protection Overlay District, and the Wetland Protection Overlay District. Ordinance §§ 195–79, 195–80, 195–82. The types of uses permitted in these protection overlay districts are limited, contingent upon the use not utilizing fill, and of a

---

1. The Property lies on the east side of Hershey Road (SR–39) in West Hanover Township, Dauphin County, Pennsylvania. (West Hanover Township Board of Supervisors Op. Findings of Fact (F.F.) ¶ 3.)

kind, such as common open space, passive recreation not involving structures, and trail access to the stream or drainageway and trails in linear parks. *See* Ordinance §§ 195–79(C), (C)(2), (C)(5)-(6) (streams), 195–80(B), (B)(2), (B)(4)-(5) (hillside and slopes), 195–82(C), (C)(1), (C)(4)-(5) (wetlands). Each of these protection overlay districts also allow, as conditional uses, driveway crossings and "any other use requiring [a] federal or state encroachment permit." Ordinance §§ 195–79(D)(5)–(6), 195–80(C)(4)–(5), 195–82(D)(4)–(5).

If the use sought by an applicant is one permitted as a conditional use in a specific Environmental Protection Overlay District, the applicant must satisfy the general criteria applicable to all protection overlay districts and, if applicable, the specific criteria applicable to the conditional use sought by the applicant. Section 195–182(A) of the Ordinance provides the general criteria applicable to all conditional uses within Environmental Protection Overlay Districts:

> (1) **Any construction within any [Environmental Protection Overlay District] shall be minimally invasive and utilize best management practices, as defined by [Pennsylvania Department of Environmental Protection] and [United States Army Corps of Engineers].**
>
> (2) A detailed site plan shall accompany the conditional use hearing application.
>
> (3) All applicable federal and state permits shall be obtained prior to any conditional use hearing.
>
> (4) All applicable federal and state permit applications shall be included in the conditional use hearing application.
>
> (5) If no federal or state permits are required, a letter stating such from the appropriate agency shall be provided prior to any conditional use hearing.
>
> (6) Other items of a reasonable and related nature for the protection of the natural features of the [Environmental Protection Overlay District], as required by the Board of Supervisors.

Ordinance § 195–182(A)(1)–(6) (emphasis added). Section 195–182(G) and (H) provide specific criteria applicable to driveway crossings and stormwater facilities. A requirement for the grant of a conditional use for driveway crossings located in any Environmental Protection Overlay District is that the applicant demonstrates that "no other viable alternative exists for the driveway." Ordinance § 195–182(G)(4). The requirements for conditional use approval of a roadway or stormwater facility are more detailed and include, *inter alia:* that "[w]here practicable, crossings of [Environmental Protection Overlay Districts] shall be located in areas of minimal width of [Environmental Protection Overlay District]"; that "[a]ny areas of fill associated with a stormwater facility shall be located outside of the [Environmental Protection Overlay District]"; and that "[s]tormwater outlet design shall be done in such a manner as to minimize any impact on the [Environmental Protection Overlay District]." Ordinance § 195–182(H)(1), (5)-(6).

Williams Holding Group, LLC (Applicant) plans to construct a residential development with some retail space on the Property in accordance with the uses encouraged by the Township's Neighborhood Commercial Zoning District. Recognizing that portions of the Property are located in Environmental Protection Overlay Districts and that each of these protection districts allows as a conditional use a use requiring state or federal encroachment permits, Applicant applied to the Pennsylvania Department of Environmental Protection and the United States Army Corps of Engineers for state and federal encroachment permits. After making the

necessary adjustments to its plans in order to secure state and federal permits, Applicant applied to the West Hanover Township Board of Supervisors (Council) for conditional use approval to construct on the South side of the Property a pipe enclosing a portion of a tributary to Manada Creek, to construct inlets and a discharge, to cover the pipe with fill, and to build roadway and driveway crossings over the enclosed stream. (F.F. ¶¶ 9–10.) Following a hearing on March 5, 2012, the Council found that:

6. Applicant intends to install a 36 inch diameter stormwater conveyance pipe, inlets, and a discharge within the [Stream Protection Overlay District], [Hillside and Slope Protection Overlay District], and [Wetlands Protection Overlay District] areas on the south side of Applicant's property.

7. The stormwater conveyance pipe on the south side of the property will enclose approximately 327 feet, and disturb another 42 feet or so of an unnamed tributary to Manada Creek all of which lie within an [Stream Protection Overlay District] and a [Hillside and Slope Protection Overlay District] for which the conditional uses are requested.[2]

8. The stormwater conveyance pipe will be covered with fill in excess of 10 feet in depth, and will, as proposed by the Applicant, substantially eliminate the steep slopes along the south side of the existing stream bank and the critical steep slope areas beyond the stream banks that lie within the [Hillside and Slope Protection Overlay District] for which that conditional use is sought.

(F.F. ¶¶ 6–8.) The Council unanimously denied Applicant conditional use approval.

In reasoning that Applicant failed to meet its burden of demonstrating compliance with the purposes and standards of the affected Environmental Protection Overlay Districts, Council first noted that the Township's standards were stricter than those applied by the Pennsylvania Department of Environmental Protection and the United States Army Corps of Engineers. (West Hanover Township Board of Supervisors Op. Reasoning (Reasoning), ¶ 1.) Next, Council rejected Applicant's assertion that the conditional use application complied with the general requirement for all conditional uses within Environmental Protection Overlay Districts that any construction shall be "minimally invasive", see Ordinance § 195–182(A)(1), and concluded:

Not only would the conveyance pipe enclosing the stream and the placing of in excess of 10 feet of fill on top of the conveyance pipe be far beyond minimally invasive, it will destroy all of the [Environmental Protection Overlay Districts] for which the conditional uses are requested.

Applicant believes that the permits/authorizations received from [the Pennsylvania Department of Environmental Protection] and the [United States Army Corps of Engineers] allow the total elimination of these [Environmental Protection Overlay Districts] through construction activities approved by those entities and, therefore, there will no longer be these [Environmental Protection Overlay Districts] to deal with and the developer can proceed to maximize development by using these former [Environmental Protection Overlay District] areas. None of the conditional uses for these [Environmental Protection Overlay Districts] would be necessary if the

2. The parties agree that the pipe will not simply disturb another 42 feet, but is in fact 369 feet in length rather than 327 feet. (See,

e.g. Dauphin County Court of Common Pleas Opinion (Trial Court Op.) at 1 and 2 n. 1.)

developer was not attempting to make the maximum use of his property by minimizing or eliminating these sensitive environmental areas, and it could make reasonable use of its property without the conditional uses requested.

(Reasoning, ¶ 3.) Applicant appealed the denial of its conditional use application to the Dauphin County Court of Common Pleas (Trial Court), which reviewed the denial based on the record before the Council. The Trial Court affirmed. In support of its holding that the conditional use application failed to comply with the requirement that conditional uses in the Environmental Protection Overlay District be "minimally invasive," *see* Ordinance § 195–182(A)(1), the Trial Court reasoned:

The particular conditional use applied for in the instant matter would impact [a Stream Protection Overlay District] and [a Hillside and Slope Protection Overlay District] which are areas with particular geographic characteristics that place them within the [Environmental Protection Overlay District]. As the [Council] pointed out, [Applicant's] application states that the [Stream Protection Overlay District] and the [Hillside and Slope Protection Overlay District] in the area where the conveyance pipe will be constructed will be completely eliminated and this contention was repeated during the hearing. (N.T. at 29, 52–55).

It is well established that a zoning board's interpretation of its zoning ordinance is to be given great weight as representing the construction of a statute by the agency charged with its execution and application. *In re Brickstone Realty Corp.*, 789 A.2d 333, 339 (Pa. Cmwlth.Ct.2001). This Court finds that the Board did not commit an error by interpreting its own zoning order to deny [Applicant's] application. As stated above, the proposed use, in the area

of the use, will completely eliminate [a Stream Protection Overlay District] and [a Hillside and Slope Protection Overlay District], land features that the Comprehensive Plan and, in turn the [Environmental Protection Overlay District] zoning ordinances seek to protect. This Court agrees with the [Council] that the proposed conditional use, if approved, would result in an impact that is well beyond minimally invasive.

[Applicant] posits an alternative argument that "minimally invasive" is defined by [Pennsylvania Department of Environmental Protection] and [United States Army Corps of Engineers] criteria. It goes on to argue that since it has obtained these permits, the [Council's] determination is improperly based on its own subjective interpretation not the objective criteria. We disagree. As referenced above, the zoning ordinance governing conditional uses in [Environmental Protection Overlay Districts] provides that any construction shall be "minimally invasive ***and*** utilize best management practices, as defined by [Pennsylvania Department of Environmental Protection] and [United States Army Corps of Engineers]." (emphasis added). Our reading of this passage does not indicate that what is minimally invasive on a particular piece of land is defined by the permitting requirements of the [Pennsylvania Department of Environmental Protection] and [United States Army Corps of Engineers]. It more logically refers to the best management practices requirements.

(Trial Court Op. at 10–11.) I agree in full with the Trial Court's reasoning that the Council did not err in interpreting its Ordinance to conclude that the plain language of the minimally invasive requirement prohibited conditional use approval where that use, if approved, would eliminate Environmental Protection Overlay Districts. Ac-

cordingly, I must dissent from the majority.

The general requirements applicable to all conditional uses within Environmental Protection Overlay Districts specify that "[a]ny construction within any [Environmental Protection Overlay District] shall be minimally invasive and utilize best management practices, as defined by [Pennsylvania Department of Environmental Protection] and [United States Army Corps of Engineers]." Ordinance §§ 195–182(A)(1). "Best management practices" is a term of art. "Minimally invasive" is not. The Council and the Trial Court did not err in concluding that the **"and"** cleaving these two requirements in the Ordinance indicated that the two requirements were separate and distinct, with only the "best management practices" criteria left to the judgment of the Pennsylvania Department of Environmental Protection and the United States Army Corps of Engineers.[3] This interpretation of the "minimally invasive" provision is reasonable and in keeping with a reviewing court's deference to the knowledge and expertise that a local government body utilizes when interpreting the ordinance that it is charged with

administering. *In re Thompson*, 896 A.2d 659, 669 (Pa.Cmwlth.2006). Federal and state encroachment permit approval does not preempt West Hanover Township's Ordinance. Federal and state requirements for issuance of encroachment permits are not coextensive with the requirements in West Hanover Township's Ordinance for conditional use approval. Under the Ordinance, the approval of encroachment permits by the Pennsylvania Department of Environmental Protection and the United States Army Corps of Engineers defines the conditional use; the Ordinance rests upon state and federal standards to set the floor, but relies upon the standards enacted and administered by the local community to set the ceiling.

The language of the Ordinance is clear and provides sufficiently objective criteria for a conditional use applicant. "When interpreting zoning ordinances, this Court relies on the common usage of words and phrases and construes language in a sensible manner." *City of Hope v. Sadsbury Township Zoning Hearing Board*, 890 A.2d 1137, 1144 (Pa.Cmwlth.2006). Minimally invasive is not commonly used to

---

**3.** Separate and apart from the sentence structure, the differentiation between which bodies should determine what is "minimally invasive" and what are the "best management practices" is entirely reasonable. The United States Army Corps of Engineers and the Pennsylvania Department of Environmental Protection are charged with making determinations based on the interests of, respectively, the nation and the Commonwealth as a whole. Neither agency can possibly determine what is "minimally invasive" for West Hanover Township; conversely, the "best management practices" for mitigating changes to the quantity and quality of water is a highly technical, dynamic, evolving field that a local municipality cannot be expected to keep a pace with on its own. Moreover, even if "minimally invasive" did refer to standards set by the United States Army Corps of Engineers and the Pennsylvania Department

of Environmental Protection, Applicant's receipt of encroachment permits still would not satisfy its burden, as Applicant admitted in its brief when it detailed the requirements it needed to satisfy to secure a general rather than small project permit. (Applicant's Brief at 21.) The small project permit application process may only be utilized in instances where an encroachment will have an "insignificant impact." (Joint Permit Applications Instructions for a Pennsylvania Water Encroachment Permit and a United States Amy Corps of Engineers Section 404 Permit Application.) Applicant did not offer evidence before the Board to support the proposition that its use fell within the United States Army Corps of Engineers and the Pennsylvania Department of Environmental Protection definition of "minimally invasive" or "insignificant impact."

mean eradication. Nor is it language that gives rise to doubt as to the intended meaning of the provision and with that doubt the possibility that Council here restricted Applicant's use of the Property based upon a meaning that was merely implied. *See* Section 603.1 of the Municipalities Planning Code, 53 P.S. § 10603.1. Even if the plain language of the "minimally invasive" provision lacked specificity when applied to another application, the provision certainly makes clear that here, where the conditional use would lead to complete destruction of sensitive natural areas that the Environmental Protection Overlay Districts were created to protect, the use is not "minimally invasive."

"One of the primary rules of statutory construction is that an ordinance must be construed, if possible, to give effect to all of its provisions. An interpretation of an ordinance which produces an absurd result is contrary to the rules of statutory construction." *In re Thompson*, 896 A.2d at 669 (internal citations omitted). The interpretation advanced by Applicant before the Council, the Trial Court, and this Court seeks to have each provision of the Ordinance read in an isolated, overly technical manner that produces the absurd result in West Hanover Township that a landowner seeking to use land in an Environmental Protection Overlay District need only destroy what the Ordinance seeks to protect in order to use the land as the owner sees fit. The Council found that Applicant's proposed use of a 369 foot long pipe, 35–inch diameter culvert and associated inlets and discharge, as well as fill in excess of 10 feet in depth in order to support a roadway and driveway, would destroy an Environmental Protection Overlay District and would be threatening to remaining environmentally protected areas. Council's conclusion is supported by substantial evidence, including Applicant's own statements in its conditional use appli-

cation. (Conditional Use Application, Reproduced Record at 105a.) Applicant did not meet its burden of demonstrating that its invasion of the Environmental Protection Overlay Districts would be minimal and instead demonstrated that its invasion is an obliteration.

Therefore, I would affirm.

