# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Protect PT, | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 39-42 C.D. 2018 |
| | : | Argued: October 16, 2018 |
| Penn Township Zoning Hearing | : | |
| Board and Apex Energy (PA), LLC | : | |

BEFORE:   HONORABLE ROBERT SIMPSON, Judge
                    HONORABLE MICHAEL H. WOJCIK, Judge
                    HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE SIMPSON**                                     **FILED: November 8, 2018**

In these four consolidated zoning appeals, Protect PT (Objector) challenges the order of the Court of Common Pleas of Westmoreland County (trial court) that affirmed the decisions of the Penn Township Zoning Hearing Board (ZHB) granting the four special exception applications filed by Apex Energy (PA), LLC (Applicant) for its oil and gas operations (unconventional gas wells), subject to conditions attached by the ZHB. Objector asserts the ZHB erred in granting the special exceptions where: (1) the record lacks substantial evidence that Applicant's proposal satisfies Section 190-635(D)(1) of the Zoning Ordinance of Penn Township (zoning ordinance) relating to the storage of toxic-produced water; (2) the record lacks substantial evidence that Applicant's proposal satisfies Section 190-641(D) of the zoning ordinance relating to the protection of citizens' environmental rights; and (3) the record contains substantial evidence that shows Applicant's proposal would create a high probability of an adverse, abnormal or

detrimental effect to the public health, safety, and welfare. Upon review, we affirm.

## I. Background

At the outset of its opinion, the trial court noted that the parties agreed on the procedural and factual background of the special exception applications at issue here.

In the fall of 2015, Applicant filed seven special exception applications with the Penn Township (Township) Zoning Office for oil and gas operations (unconventional gas wells). Applicant proposed to develop well pads on parcels located in the Township's Rural Resource zoning district, which also lie in the Township's Mineral Extraction Overlay District (MEO).

After hearings and decisions denying three of the applications in 2016, Applicant filed suit in federal court against the ZHB, the Township and the Township's Board of Commissioners. The federal suit concluded with an agreement of the parties, which a federal trial court approved and incorporated into a stipulation for entry of consent judgment. The trial court here noted that, although the parties disagreed on the proper interpretation of the consent judgment, it effectively required Applicant to agree to implement a set of conditions on the well pads in exchange for the Township, the ZHB, and the Board of Commissioners agreeing to be bound by certain interpretations of the zoning ordinance and Article I, Section 27 of the Pennsylvania Constitution (the Environmental Rights Amendment). Under the federal trial court's consent order, the Township was directed to provide all permitting for the three denied special

2

exception applications. Hearings ensued before the ZHB on Applicant's remaining

four special exception applications.[1]

---

[1] The following additional background is helpful. In June 2014, Applicant's representatives met with the Township's staff to present a drilling plan consisting of seven proposed unconventional natural gas well pad sites, including the Numis, Backus, Deutsch, and Drakulic well pads, which are the four well pads at issue in these consolidated appeals. At that time, the Township permitted drilling in all zoning districts through a savings clause requiring an applicant to obtain special exception approval subject to four objective criteria. After receiving information regarding Applicant's plans, in October 2014, the Township Commissioners enacted Resolution No. 85/2014. Through Resolution No. 85/2014, the Township Commissioners directed that all zoning applications be reviewed in accordance with a proposed "amended, revised, updated, codified, and recodified Zoning Ordinance and Zoning Map" (Pending Ordinance). Reproduced Record (R.R.) at 1553a. The Pending Ordinance limited "Oil and Gas Operations" to the MEO District--a district comprised of the Industrial Commerce District and the Rural Resource District--by conditional use. No public hearing occurred on the Pending Ordinance. R.R. at 3183a.

Thereafter, in December 2014, following discussions with the Township, Applicant prepared and submitted applications for conditional use and land development plan approval for the Quest Central Pad-7. In response, the Township amended the Pending Ordinance by approving Resolution 33/2015. R.R. at 1546a-48a. Resolution 33/2015 modified the permitting procedures to require applicants to seek a special exception for oil and gas operations in the MEO District.

Applicant proceeded with its application for the Quest Central Pad-7 in the MEO District, and the ZHB approved that application. In 2015, Applicant constructed and placed the Quest Central Pad-7 into production. Having placed the Quest Central Pad-7 into production, Applicant submitted seven additional applications for special exception approval to the ZHB. All seven applications sought to construct well pads in the MEO District under the Pending Ordinance and were consistent with the materials submitted for the Quest Central Pad-7. After several hearings, the ZHB denied three of the special exception applications. Applicant then filed its federal suit challenging, among other things, the denial of its applications under what it alleged was the unconstitutionally vague Pending Ordinance. At approximately the same time, in June 2016, the Township published the fifth "Penn Township Pending Ordinance" revision (Fifth Revision) on the Township website. R.R. at 631a-32a. The Township held a hearing on the Fifth Revision and ultimately adopted the Fifth Revision as its comprehensive zoning ordinance in September 2016 (Current Ordinance). R.R. at 1403a-70a.

Ultimately, Applicant, the Township, the ZHB, and the Township Commissioners entered into an agreement to resolve the federal suit, which the federal trial court approved by order. Under the consent order, the Township was directed to provide all permitting for the three denied special exception applications. The parties further agreed that the remaining four special exception applications for the Numis, Backus, Deutsch, and Drakulic well pads would proceed before the ZHB.

Specifically, in September and October 2016, the ZHB held hearings on Applicant's request for a special exception to conduct unconventional gas drilling on property owned by Top Shop Manufacturing, known as the Backus well pad. The ZHB subsequently continued the hearings pending the outcome of Applicant's federal suit. After entry of the consent judgment, the ZHB held hearings in January 2017. Ultimately, the ZHB issued a decision granting the special exception for the Backus well pad subject to various conditions.

In addition, in January 2017, the ZHB held a hearing on Applicant's request for a special exception for unconventional gas drilling on property owned by the Numis Corporation (Numis well pad). After the hearing, the ZHB issued a decision granting the special exception for the Numis well pad subject to various conditions.

Also in January 2017, the ZHB held hearings on Applicant's request for a special exception for unconventional gas drilling on property owned by Melvin and Susan Deutsch (Deutsch well pad). The ZHB subsequently issued a decision granting the special exception for the Deutsch well pad subject to various conditions.

Finally, the ZHB also held a hearing in January 2017 on Applicant's request for a special exception for unconventional gas drilling on property owned by John and Mildred Drakulic (Drakulic well pad). At that time, by agreement of the parties, testimony from the prior hearings on the special exception applications was introduced and incorporated into the record. The ZHB subsequently issued a

decision granting the special exception for the Drakulic well pad subject to various conditions. Objector fully participated in the ZHB hearings.

Objector appealed the ZHB's decisions granting Applicant's four special exception applications. Without taking additional evidence, the trial court affirmed.

In an opinion in support of its order, the trial court first rejected Applicant's argument that Objector lacked standing to pursue its appeals.[2] As to the merits, the trial court rejected Objector's assertions that Applicant did not prove its proposed uses complied with Sections 190-635(D)(1) and 190-641(D) of the zoning ordinance. To that end, the trial court determined that, in its four detailed decisions, the ZHB carefully considered the evidence and correctly applied all relevant special exception requirements, including Sections 190-635(D)(1) and 190-641(D) of the zoning ordinance. Additionally, the trial court determined the ZHB did not err in determining Applicant's proposed oil and gas operations (unconventional gas wells) would not adversely impact the community. Objector now appeals to this Court.

## II. Issues

On appeal,[3] Objector raises three issues. Specifically, it argues the ZHB erred in granting the four requested special exceptions where: (1) the record

---

[2] The issue of whether Objector has standing is not raised in these consolidated appeals.

[3] Because the parties presented no additional evidence after the ZHB's decision, our review is limited to determining whether the ZHB committed an abuse of discretion or an error **(Footnote continued on next page…)**

5

lacks substantial evidence that Applicant's proposal satisfies Section 190-635(D)(1) of the zoning ordinance (relating to the storage of toxic-produced water); (2) the record lacks substantial evidence that Applicant's proposal satisfies Section 190-641(D) of the zoning ordinance (relating to the protection of citizens' environmental rights); and (3) the record contains substantial evidence that shows Applicant's proposal would create a high probability of an adverse, abnormal or detrimental effect to public health, safety, and welfare.

## III. Discussion
### A. Applicant's Compliance with §190-635(D)(1) of the Zoning Ordinance
### 1. Contentions

Objector first argues[4] that the ZHB lacked substantial evidence to find that Applicant complied with Section 190-635(D)(1) of the zoning ordinance, which relates to the storage of toxic-produced water. Objector asserts that Applicant proposed to store toxic-produced water on-site, above ground and outdoors in quantities greater than permitted by the zoning ordinance. Objector contends that the ZHB did not make a specific finding regarding Applicant's compliance with Section 190-635(D)(1) of the zoning ordinance. As a result, Objector maintains, the ZHB lacked substantial evidence to find compliance with Section 190-635(D)(1).

---

**(continued…)**

of law. Allegheny Tower Assocs., LLC v. City of Scranton Zoning Hearing Bd., 152 A.3d 1118 (Pa. Cmwlth. 2017).

[4] Objector filed identical briefs for each of the four consolidated appeals. Additionally, the briefs filed by Applicant and the ZHB in each of the four consolidated appeals are substantially similar. Therefore, we address the ZHB's grant of the four special exception applications together.

6

## 2. Analysis

The ZHB is the sole judge of the credibility of witnesses and the weight afforded their testimony. Tri-County Landfill, Inc. v. Pine Twp. Zoning Hearing Bd., 83 A.3d 488 (Pa. Cmwlth. 2014). It is the function of the ZHB to weigh the evidence before it. Id. This Court may not substitute its interpretation of the evidence for that of the ZHB. Id. Assuming the record contains substantial evidence, we are bound by the ZHB's findings that result from resolutions of credibility and conflicting testimony rather than a capricious disregard of evidence. Id.

Further, a ZHB is free to reject even uncontradicted testimony it finds lacking in credibility, including testimony offered by an expert witness. Id. A ZHB does not abuse its discretion by choosing to believe the opinion of one expert over that offered by another. Id.

When performing a substantial evidence analysis, courts must view the evidence in the light most favorable to the party that prevailed before the fact-finder. Liberties Lofts LLC v. Zoning Bd. of Adjustment, 182 A.3d 513 (Pa. Cmwlth. 2018). It is irrelevant whether the record contains evidence to support findings other than those made by the fact finder; the critical inquiry is whether there is evidence to support the findings actually made. Id. If there is, an appellate court may not disturb the ZHB's findings. Id.

A special exception is neither special nor an exception, but rather a use expressly contemplated that evidences a legislative decision that the particular type of use is consistent with the zoning plan and presumptively consistent with the

7

health, safety and welfare of the community. Greth Dev. Grp., Inc. v. Zoning Hearing Bd. of L. Heidelberg Twp., 918 A.2d 181 (Pa. Cmwlth. 2007). Further, as Robert S. Ryan explains:

> Zoning boards often hear protestants argue that an applicant for a special exception should be required to observe the law as set forth in the zoning ordinance. That argument is appropriate in an application for a variance, but not in a case involving a special exception. The applicant for an exception *is* following the zoning ordinance. His application is one envisioned by the ordinance and, if the standards established by the ordinance are met, his use is one permitted by its express terms.

Robert S. Ryan, PENNSYLVANIA ZONING LAW AND PRACTICE, §5.1.1 (2001) (emphasis in original).

An applicant for a special exception has both the duty of presenting evidence and the burden of persuading the ZHB that its proposed use satisfies the objective requirements of the zoning ordinance for the grant of the special exception. Manor HealthCare Corp. v. L. Moreland Twp. Zoning Hearing Bd., 590 A.2d 65 (Pa. Cmwlth. 1991). Once the applicant meets its burdens of proof and persuasion, a presumption arises that the proposed use is consistent with the health, safety and general welfare of the community. Id. The burden then normally shifts to the objectors to present evidence and persuade the ZHB that the proposed use will have a generally detrimental effect on health, safety and welfare. Id. The evidence presented by the objectors must show, to a high degree of probability, that the use will generate adverse impacts not normally generated by this type of use and that these impacts will pose a substantial threat to the health and safety of

8

the community.  Greaton Props., Inc. v. L. Merion Twp., 796 A.2d 1038 (Pa. Cmwlth. 2002).

Further, in Bray v. Zoning Board of Adjustment, 410 A.2d 909 (Pa. Cmwlth. 1980), this Court outlined the rules regarding the "initial evidence presentation duty (duty) and persuasion burden (burden) in special exception cases" as follows:

> *Specific requirements*, e.g., categorical definition of the special exception as a use type or other matter, and objective standards governing such matter as a special exception and generally:
>
> The applicant has both the duty and the burden.
>
> *General detrimental effect*, e.g., to the health, safety and welfare of the neighborhood:
>
> Objectors have both the duty and the burden; the ordinance terms can place the burden on the applicant but cannot shift the duty.
>
> *General policy concern*, e.g., as to harmony with the spirit, intent or purpose of the ordinance:
>
> Objectors have both the duty and the burden; the ordinance terms cannot place the burden on the applicant or shift the duty to the applicant.

Id. at 912-13 (underlined emphasis added).

In Bray, we further explained the requirement that an applicant bears the burden of both persuasion and the initial duty to present evidence "to show that the proposal complies with the 'terms of the ordinance' which expressly govern such a grant." Id. at 910.  This rule means the applicant must bring the proposal

9

within the specific requirements expressed in the ordinance for the use (or area, bulk, parking or other approval) sought as a special exception. Those specific requirements, standards or "conditions" can be classified as follows:

> 1. The kind of use (or area, bulk, parking or other approval)—i.e., the threshold definition of what is authorized as a special exception;
>
> 2. Specific requirements or standards applicable to the special exception—e.g., special setbacks, size limitations; and
>
> 3. Specific requirements applicable to such kind of use even when not a special exception—e.g., setback limits or size maximums or parking requirements applicable to that type of use whenever allowed, as a permitted use or otherwise.

Id. at 911.

The interpretation of a zoning ordinance is a question of law. THW Grp., LLC v. Zoning Bd. of Adjustment, 86 A.3d 330 (Pa. Cmwlth. 2014). As with statutes, the primary objective of interpreting ordinances is to determine the intent of the legislative body that enacted the ordinance. Id. In pursuing that end, we are mindful that a statute's plain language generally provides the best indication of legislative intent. Id. Thus, statutory construction begins with an examination of the text itself. Id.

In reading the plain language of a statute, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage." 1 Pa. C.S. §1903(a). Further, every statute shall be construed, if possible, to give effect to all its provisions so that no provision is "mere

10

surplusage." 1 Pa. C.S. §1921(a). Where the words in an ordinance are free from all ambiguity, the letter of the ordinance may not be disregarded under the pretext of pursuing its spirit. 1 Pa. C.S. §1921; see also 1 Pa. C.S. §1903 (words and phrases in a statute shall be construed in accordance with their common and accepted usage).

Also, where a court needs to define an undefined term, it may consult dictionary definitions for guidance, although such definitions are not controlling. THW Grp.

In addition, zoning ordinances must be construed expansively so as to afford the landowner the broadest possible use and enjoyment of his land. Id.

Further,

> a [ZHB] is the entity charged with the interpretation and application of the zoning ordinance. It is well settled that a [ZHB's] interpretation of its own zoning ordinance is entitled to great weight and deference from a reviewing court. This principle is also codified in Section 1921(c)(8) of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1921(c)(8). The basis for the judicial deference is the knowledge and expertise that a [ZHB] possesses to interpret the ordinance that it is charged with administering.

Tri-County, 83 A.3d at 510 (citation omitted).

Here, Objector asserts Applicant did not prove compliance with Section 190-635(D)(1) of the zoning ordinance. Section 190-635 sets forth

11

"Performance Standards" for "[a]ll uses in all districts[.]" Subsection (D)(1) of that provision states:

> D. Storage and waste disposal.
>
> (1) No highly flammable, explosive or toxic liquids, solids or gases shall be stored in bulk (over 500 gallons), above ground, except in an enclosed building and except new tanks or drums of fuel connected directly with energy devices or heating appliances located and operated on the same lot as the tanks or drums of fuel.

In all four of its decisions approving Applicant's special exception applications, the ZHB explicitly determined that Applicant met the performance standards set forth in Section 190-635 of the zoning ordinance. ZHB Op. (Drakulic Site), Findings of Fact (F.F.) No. 90, Concls. of Law Nos. 134, 138; ZHB Op. (Numis Site), F.F. No. 74, Concl. of Law No. 107; ZHB Op. (Backus Site), F.F. No. 92, Concl. of Law 139; ZHB Op. (Deutsch Site), F.F. No. 92, Concl. of Law No. 140. Additionally, in none of its four decisions approving Applicant's special exception requests did the ZHB determine Applicant's proposed uses involved the storage of *toxic liquids* so as to implicate Section 190-635(D)(1) of the zoning ordinance.

Nevertheless, Objector argues that wastewater associated with Applicant's proposed uses is "toxic," is produced in quantities over 500 gallons, and is stored on-site while the wells are in production in violation of Section 190-635(D)(1) of the zoning ordinance. We reject this argument.

12

The zoning ordinance does not define the term "toxic." However, it states,"[i]n the absence of a specific definition in [Section] 190-202 [(of the zoning ordinance) ("Definitions")], any word used in this Chapter shall have its customary dictionary definition as contained in the most recent edition of Webster's Collegiate Dictionary." Section 190-201(B) of the zoning ordinance.

In turn, Merriam-Webster's Collegiate Dictionary defines "toxic" as "containing or being poisonous material especially when capable of causing death or serious debilitation[.]"[5]

In support of its argument that the wastewater associated with Applicant's proposed uses is "toxic," Objector points to the cross-examination testimony of Ed Long, Applicant's Chief Operations Officer. Contrary to Objector's argument, Long testified that the "wastewater" Applicant would store here is "brine," which is "water with salt." Reproduced Record (R.R.) at 760a. Long testified the wastewater is not explosive or flammable. R.R. at 759a. Further, although Long testified, "you probably don't want to drink [the wastewater][,]" contrary to Objector's assertions, he did not testify the wastewater is "toxic" as that term is defined in the dictionary. Indeed, Long indicated he could not answer whether the wastewater was, in fact, toxic. Id. Thus, contrary to Objector's assertions, Long's testimony on cross-examination does not establish that the wastewater constitutes a toxic liquid as contemplated by Section 190-635(D)(1) of the zoning ordinance.

---

[5] https://iklearn.com/en/home/?r=dictionary/collegiate/toxic (last visited October 18, 2018).

In addition, Objector's attempt to characterize "wastewater" as a "toxic liquid" is not supported by the applicable provisions of the zoning ordinance. The zoning ordinance defines "Oil and Gas Operations (unconventional gas wells)," the uses at issue here, as including, among other things: "Water and other fluid storage or impoundment areas used exclusively for oil and gas operations[.]" Section 190-202 of the zoning ordinance. Further, the zoning ordinance defines the term "wastewater (unconventional well)" as: "The post-drilling liquids or fluids used in the fracking or extraction process." Id. Therefore, contrary to Objector's assertions, the zoning ordinance classifies and expressly defines wastewater distinctly from the "toxic liquids" referred to in Section 190-635(D)(1) of the zoning ordinance.

Our review of the more specific zoning ordinance provisions governing the MEO District, the overlay district in which the properties at issue lie, discloses further support for this conclusion. See Section 190-407 of the zoning ordinance. Section 190-407(E) of the zoning ordinance permits Applicant's proposed "Oil and natural gas drilling (unconventional gas well)" uses by special exception. Further, Section 190-407(G), which contains "Development standards" for uses in the MEO district, states:

> (3) Wastewater: Copies of all required Pennsylvania [Department of Environmental Protection (DEP)] permits or permits from the Municipal Authority with jurisdiction agreeing to accept any affluent produced shall be provided that cannot be treated on-site shall not be permitted to accumulate and shall be disposed of on a regular basis as required.
>
> (a) In no case shall wastewater be dumped or permitted as flow or seep into a stream or drainage way.

14

(b) Wastewater that cannot be treated on-site shall not be permitted to accumulate and shall be disposed on a regular basis as required.

Section 190-407(G)(3) of the zoning ordinance.

In the subsection that immediately follows these wastewater standards, the zoning ordinance sets forth standards for "Hazardous or toxic waste." Section 190-407(G)(4) of the zoning ordinance ("Hazardous or toxic waste: Hazardous or toxic waste shall not be permitted to accumulate on any property, and disposal shall be in compliance with applicable Commonwealth of Pennsylvania hazardous or toxic waste handling regulations."). By setting forth separate standards for wastewater and toxic waste, it appears clear that the Township's governing body intended to classify wastewater separately from "toxic" materials. Id. This distinction is consistent with DEP's classification of wastewater as "residual waste" rather than "hazardous residual waste." R.R. at 1169a (emphasis added). Moreover, in each of its four decisions, the ZHB expressly determined that Applicant complied with the development standards set forth in Section 190-407 of the zoning ordinance, which includes the wastewater standards quoted above.[6]

---

[6] More particularly, the ZHB made the following findings regarding wastewater generated by Applicant's proposed uses:

72. Wastewater recovered from the fracking operation will be temporarily stored as recovered in mobile tanks on site and removed from the site on a regular basis.

73. The mobile tanks contain a barrier that includes an impermeable Kevlar liner underneath.

**(Footnote continued on next page…)**

15

For all these reasons, Objector's argument that Applicant did not prove compliance with Section 190-635(D)(1) of the zoning ordinance fails.

## B. Applicant's Compliance with §190-641(D) of the Zoning Ordinance
### 1. Contentions

Objector next argues that the ZHB lacked substantial evidence to find that Applicant complied with Section 190-641(D) of the zoning ordinance, which

---

**(continued…)**

> 74. Wastewater recovered from the fracking operation will be approximately 15-20% of the freshwater amounts injected into wells at the site.
>
> 75. Adequate containment is to be provided to protect from accidental wastewater release.
>
> 76. No wastewater treatment will occur on site.
>
> 77. No wastewater will be injected into any injection wells as a method of disposal.
>
> * * * *
>
> 80. Clean up will take approximately thirty days requiring the removal of fracking equipment, temporary wastewater and freshwater storage tanks, residential trailers and other related equipment.
>
> 81. Final site clean-up and securing will require the presence of four to five individuals once the equipment has been removed from the site.
>
> 82. Post-completion visits to producing site will involve two pickup trucks per day and water removal trucks one to two times per month.

ZHB Op. (Drakulic Site), F.F. Nos. 72-77, 80-82; ZHB Op. (Numis Site) F.F. Nos. 62-65, 68-70; ZHB Op. (Backus Site), F.F. Nos. 73-78, 82-83; ZHB Op. (Deutsch Site), F.F. Nos. 72-77, 81-83.

relates to the protection of environmental rights. Objector asserts Section 190-641(D) requires a site-specific pre-action analysis to show that the proposed activities will not harm or degrade the community's environmental rights. Here, Objector contends there is no evidence to show: (1) how normal operation of the well pads during the construction, drilling, completion and production stages would impact air quality and health; or (2) how a subsurface release of fluid may impact water resources. Objector maintains that Applicant failed to quantify air emissions from each stage of its operations and failed to identify subsurface pathways that a release of fluid may follow. Objector further argues that the federal consent judgment conditions do not constitute a pre-action analysis. Thus, Objector argues, the ZHB lacked substantial evidence to find that Applicant complied with Section 190-641(D) of the zoning ordinance.

## 2. Analysis

As indicated above, the various burdens in special exception cases can be summarized as follows:

> [A]s to specific requirements of the zoning ordinance, the applicant has the persuasion burden, as well as the initial evidence presentation burden. The objectors have the initial evidence presentation duty with respect to the general matter of detriment to health, safety and general welfare, <u>even if the ordinance has expressly placed the persuasion burden upon the applicant</u>, where it remains if detriment is identified ….

<u>Williams Holding Grp., LLC v. Bd. of Supervisors of W. Hanover Twp.</u>, 101 A.3d 1202, 1213 (Pa. Cmwlth. 2014) (quoting <u>Bray</u> 410 A.2d at 912) (emphasis added). As we summarized in <u>Williams</u> (with emphasis added):

17

Thus, if a requirement is interpreted as one upon which the burden is placed on an applicant, but the requirement is nonobjective or too vague to afford the applicant knowledge of the means by which to comply, the requirement is either one that is not enforceable ..., or, <u>if it relates to public detriment, the burden shifts to an objector, who must demonstrate that the applicant's proposed use would constitute such a detriment</u>.

Id.

Section 190-641(D) of the zoning ordinance states:

The applicant shall demonstrate that the drill site operations will not violate the citizens of Penn Township's right to clean air and pure water as set forth in Art. 1 Sec. 27 of the Pennsylvania Constitution (The Environmental Rights Amendment). The applicant shall have the burden to demonstrate that its operations will not affect the health, safety or welfare of the citizens of [the] Township or any other potentially affected land owner. The application submitted shall include reports from qualified [e]nvironmental individuals attesting that the proposed location will not negatively impact the Township residents' Environmental Rights; and, will include air modelling and hydrogeological studies as potential pathways that a spill or release of fluid may follow.

Thus, the plain language of this criterion: (1) requires an applicant to show that drill site operations will not violate the Township citizens' right to clean air and pure water as set forth in Article I, Section 27 of the Pennsylvania Constitution; (2) places the burden on an applicant to show its operations will not affect the health, safety or welfare of the Township's citizens; and (3) requires an applicant to submit reports from qualified environmental individuals attesting that the proposed location will not negatively impact the Township residents'

18

environmental rights and include air modelling and hydrogeological studies as potential pathways that a spill or release of fluid may follow.

The first two components of this criterion relate to general detrimental effects. As such, although the zoning ordinance can (and here does) place the burden of persuasion on Applicant, it cannot shift the initial evidence presentation duty. Williams; Bray. And, as set forth in greater detail below, in our analysis of Objector's third issue, the ZHB here determined that Objector did not present sufficient, credible evidence, to show to a high degree of probability, that Applicant's use would generate adverse impacts not normally generated by this type of use and that these impacts would pose a substantial threat to the health and safety of the community.

As to the third component of this criterion, requiring submission of environmental reports, Applicant bore both the initial evidence presentation duty and the persuasion burden.

Regardless of which party bore the initial evidence presentation duty and persuasion burden, the ZHB determined that Applicant provided sufficient, satisfactory information to satisfy Section 190-641(D) of the zoning ordinance in each of its four decisions approving Applicant's special exception applications.

More particularly, the ZHB made the following determinations regarding Applicant's submissions:

> 10. Pursuant to a Stipulation and Consent Order dated December 16, 2016 in the matter of [Apex Energy v.

19

Penn Township], in the United States District Court for the Western District of Pennsylvania at case 16-cv-769 ('Stipulation'), [Applicant] has agreed to several conditions concerning sound wall containment, noise monitoring, air quality monitoring, permit submission, traffic coordination and control and other matters, said conditions to be included in the Decision of the [ZHB]. [See] Applicant Exhibits 4 & 5.

11. [Applicant] has received approval and an ESCGP-2 [(Erosion and Sediment Control General Permit-2)] permit from [DEP] for development of the site. [See] Apex Exhibit 3A.

12. [Applicant] has received the required [DEP] permit for the drilling of one well at the site. [See] Apex Exhibit 3B.

13. Pursuant to the terms of the [Stipulation,] [Applicant] will be required to provide all necessary third party permits to the Township prior to initiation of development activity at the Drakulic site.

* * * *

41. The pad area will be protected by three barriers consisting of alternating layers of liners and wooden board mats with polyurethane sealant coating surrounded by an eight-inch high containment barrier to handle potential spills of liquids during the operations.

* * * *

44. [Applicant] outlined a casing and cementing regimen that must be [DEP-approved] involving five casing strings that will protect the well bores.

45. All five casings protect the groundwater in the area.

* * * *

85. Pursuant to the [Stipulation,] [Applicant] has agreed, as part of the proposed air quality monitoring plan, that

20

the Township will be provided immediate notice of any [DEP] reportable spills at the site with the Township having the option to request air quality sampling and monitoring of the spill and its remediation period.

* * * *

87. Per the Stipulation, [Applicant] will be required to monitor air quality and noise production through independent third party contractors during the construction, drilling and completion phases of the development.

* * * *

89. [Applicant] submitted Air and Hydrogeologic Assessment Reports prepared by Environmental Resources Management (ERM), prepared under the supervision of Brian Sterner, who holds a Bachelor of Science Degree and is certified in a variety of environmental disciplines.

90. ERM's report was multi-disciplinary and prepared in response to the provisions [sic] Section 190-641(D) regarding the requirements that applicants demonstrate oil and gas drilling operations will not violate citizens' right to clean air and water as guaranteed by Article I, § 27 of the Pennsylvania Constitution.

91. The ERM report reviewed and analyzed the risks presented by 'accidental' release of materials at the Drakulic pad and set forth categorization of the nature and context of those risks.

92. ERM used formulas and procedures designed to include industry risk assessment standards that identified chemicals and other stored materials, [Applicant's] prior … operational history including site operations, industry standards for those operations, topography, hydrology, geology and barriers and controls proposed for the site in terms of the redundancy of those barriers and their mitigation effects.

21

93. The preparation of the evaluation also took into consideration the location of receptors, such as residences or waterways, incorporating that information into formulas that looked to the frequency and severity of potential events.

94. Contributors to the report included a geologist and air quality specialist.

95. The ERM air risk calculation study established that the potential risk for hazardous emissions from an accidental or inadvertent spill at the Drakulic Pad would be low, although the report did not include any air dispersion modeling.

96. The report further indicated that there was a low chance of off-site migration of such emissions.

97. The ERM study also indicated that the risk for exposure to water sources as a result of a spill at the Drakulic Pad to be low to moderate.

98. The moderate risk assessment resulted from the acknowledged, though rare, possible catastrophic failure of the closed wastewater storage vessels onsite.

99. No review of subsurface contamination potential was conducted by ERM as part of its studies.

100. ERM air modeling studies and review related to the volatilization of chemicals if spilled or released.

101. ERM employed receptor-based air modeling to reach it conclusions on the low risk air assessment[.]

102. Mr. Sterner testified that receptor[-]based modeling is one of three approved methodologies endorsed by the federal Environmental Protection Agency (EPA).

103. [Applicant's] proposed use is presently subject to Exemption 38, a delegation of authority from the EPA to the [DEP] that outlines certain exemptions applicable to unconventional gas wells from air permitting sources.

104. This exemption requires that the operator perform calculations with respect to anticipated total emissions and file ongoing information to demonstrate compliance with the Exemption's requirements.

105. ERM's analysis of the site characteristics along with the anticipated development operations indicated that the likelihood of an event occurring that would give rise to a moderate risk is remote.

\* \* \* \*

138. [Applicant's] agreement to abide by the terms and conditions of the [Stipulation], along with the ERM Air & Hydrogeologic study, provides sufficient satisfactory information to demonstrate that requirements of Section 190-641(D) have been satisfied.

ZHB Op. (Drakulic Site), F.F. Nos. 10-13, 41, 44-45, 85, 87, 89-105, 138; see also ZHB Op. (Backus Site), F.F. Nos. 12-14, 41, 45-46, 87, 89, 91-106; ZHB Op. (Deutsch Site), F.F. Nos. 10-13, 41, 44-45, 86, 88, 91-107; ZHB Op. (Numis Site) F.F. Nos. 7, 11-12, 31, 36, 55, 73-81. The record supports the ZHB's findings. R.R. at 718a-19a; 725a-26a; 788a; 943a-44a; 949a-951a; 953a; 989a; 990a; 1185a; 1300a-01a; 1305a; 1309a; R.R. at 1318a; 1682a-1719a (Numis Well Pad Air and Hydrogeologic Report, Township of Penn, Westmoreland County, PA); R.R. at 1720a-1749a; 1750a-52a; R.R. at 1781a-2096a (Backus Well Pad Air and Hydrogeologic Report, Township of Penn, Westmoreland County, PA); R.R. at 2121a-2137a; 2138a-2140a; R.R. at 2552a-2801a (Deutsch Well Pad Air and Hydrogeologic Report, Township of Penn, Westmoreland County, PA); R.R. at 2802a-2827a; R.R. at 2828a-2830a; R.R. at 2848a-3145a (Drakulic Well Pad Air and Hydrogeologic Report, Township of Penn, Westmoreland County, PA); R.R. at 3146a-3170a; R.R. at 3171a-3174a; R.R. at 3175a-3200a (Federal Consent Judgment).

23

Further, while Objector challenges the sufficiency of Applicant's ERM Report's air modelling and hydrogeology studies *generally*, Section 190-641 of the zoning ordinance only requires that the report "include air modelling and hydrogeological studies as potential pathways that a spill or release of fluid may follow." Id. (emphasis added). Here, the ZHB's supported determinations reveal that Applicant's ERM Report satisfied that requirement.

In addition, the ZHB attached several detailed conditions to its grant of the requested special exceptions aimed at mitigating and monitoring any potential adverse impacts. Of relevance here, the ZHB attached the following condition to its grant of all four requested special exceptions (with emphasis added):

> [Applicant] shall participate with or agree to the monitoring of air quality emissions and particulate content during drilling and completion activities. [Applicant] will agree to pay for third-party monitoring and testing from a mutually acceptable expert with experience in this industry. The expert shall take baseline readings at the [well pads]. The expert shall engage in active monitoring twice a week on the [pads]. Testing locations shall be established on relevant parcel or leasehold boundaries but, in all events, the only location that will be used for air monitoring located within [Applicant's] established limit of disturbance shall be situated at the access road entrance. No other air monitoring equipment will be located within [Applicant's] limit of disturbance including, but not limited to, the [pads] or associated stormwater or erosion and sedimentation control facilities. [Applicant] will notify the Township if any monitoring for OSHA [(Occupational Safety and Health Administration)] emissions requirements at the site exceed OSHA standards. In the event that a DEP reportable spill or any spill that is reported to [DEP] by [Applicant] occurs at

24

the [p]ad site[s], the Township may require immediate air monitoring until the spill is abated or remediated. Other than in emergency situations, [Applicant] will not flare or incinerate natural gas at the [well pads] during completion or flowback operations and [Applicant] will comply with all state and federal regulations applicable to emissions relating to its operations on the [p]ad[s]. This condition shall conclusively establish compliance with Section 190-407(G)(9) <u>and also show compliance with Section 190-641(D)</u>.

ZHB Op. (Drakulic Site) at 19 (condition 6); ZHB Op. (Backus Site) at 19 (condition 6); ZHB Op. (Deutsch Site) at 19 (condition 6); ZHB Op. (Numis Site) at 16 (condition 6).

Further, while Objector relies on the testimony of its expert, Dr. Ron Sahu, in support of its assertions that Applicant did not perform an adequate site-specific pre-action analysis, the ZHB did not accept the testimony of Objector's expert. In declining to accept his testimony, the ZHB found that, while Objector's expert criticized Applicant for using data and values from the Texas Commission on Environmental Quality (TCEQ), "Applicant offered uncontroverted testimony that the TCEQ provided the best available data and is routinely accepted by state and federal regulatory agencies." ZHB Op. (Drakulic Site), F.F. No. 110; ZHB Op. (Backus Site) F.F. No. 111; ZHB Op. (Deutsch Site) F.F. No. 112. We cannot disturb the ZHB's determinations regarding credibility and evidentiary weight. <u>Tri-County</u>.

In addition, although Objector asserts that Applicant experienced a mechanical malfunction at one of its other sites (referred to as the Quest well pad, which is not one of the four well pads at issue in this appeal) that resulted in a spill

of an odorant, the ZHB here expressly found that, in response to this incident: "[Applicant] has undertaken remedial measures on its equipment to further minimize the risk of release if this would occur again." F.F. No. 58 (Numis Site) (emphasis added). Objector does not dispute this finding.

Objector also maintains that, at a minimum, Section 190-641(D) of the zoning ordinance requires an applicant to show its proposal will comply with DEP regulations intended to protect environmental resources. In support, it cites an Environmental Hearing Board opinion concerning the application of Article I, Section 27 of the Pennsylvania Constitution. See Ctr. for Coalfield Justice & Sierra Club v. Dep't of Envtl. Prot.[7] Contrary to Objector's assertions, our review of Section 190-641(D) discloses no requirement that an applicant prove compliance with DEP statutory or regulatory requirements as part of its burden to obtain a special exception for oil and gas operations (unconventional gas wells). Moreover, such issues fall within the jurisdiction of DEP, not the ZHB.

For these reasons, we reject Objector's argument that Applicant did not prove compliance with Section 190-641(D) of the zoning ordinance.

---

[7] (EHB Dkt. Nos. 2014-072-B, 2014-083-B, 2015-051-B, filed Aug. 15, 2017), 2017 WL 3842580. In its reply brief, Objector also cites the Environmental Hearing Board's analysis of Article I, Section 27 of the Pennsylvania Constitution as set forth in The Delaware Riverkeeper Network v. Department of Environmental Protection (EHB Dkt. Nos. 2014-142-B, 2015-157-B, filed May 11, 2018), 2018 WL 2294492.

26

## C. Alleged Adverse Impacts
### 1. Contentions

As a final issue, Objector argues it presented substantial evidence that well pad development would cause detrimental impacts to the community. Objector asserts it presented evidence that the well pads would result in risks to health and safety, including harmful air emissions that would impact nearby residents and students at Level Green Elementary School. Objector contends it also presented evidence that the well pads would harm the use and enjoyment of private property, including disrupting normal activities and harming property values. Objector maintains it also presented evidence that the well pads would forever alter the character of the quiet residential neighborhoods where they are proposed by turning the area over to continued heavy industrial activity. In granting special exception approval, Objector argues, the ZHB failed to uphold its constitutional duty under Article I, Section 27 of the Pennsylvania Constitution to protect the citizens' environmental rights. Objector asserts the weight of evidence showed that Applicant's proposal would not comply with the zoning ordinance's criteria and would, in fact, degrade the community's environmental rights.

### 2. Analysis

Here, in each of its four decisions granting the requested special exceptions, the ZHB found: "Objecting parties have failed to establish sufficient, credible evidence … that [Applicant's proposed] use would create a high probability of an adverse, abnormal or detrimental effect [on] public health, safety and welfare." ZHB Op. (Drakulic Site), F.F. No. 139 (emphasis added); ZHB Op. (Backus Site), F.F. No. 140; ZHB Op. (Deutsch Site), F.F. No. 141; ZHB Op. (Numis Site), F.F. No. 108. The ZHB did not credit Objector's expert or lay

27

testimony regarding the purported adverse impacts occasioned by Applicant's proposed uses, and this Court cannot revisit the ZHB's determinations as to credibility and evidentiary weight on appeal. Tri-County.

Further, to the extent Objector raised concerns over property values, general testimony regarding aesthetic concerns and a potential decrease in property values was not sufficient to satisfy Objector's burden of proof. See, e.g., Allegheny Tower Assocs., LLC v. City of Scranton Zoning Hearing Bd., 152 A.3d 1118 (Pa. Cmwlth. 2017). Additionally, as to Objector's concerns over increased traffic, this Court previously explained:

> '[A]n increase in traffic is generally not grounds for denial of a [special exception] unless there is a high probability that the proposed use will generate traffic not normally generated by that type of use and that the abnormal traffic threatens safety.' Accelerated Enters., Inc. v. The Hazle Twp. Zoning Hearing Bd., 773 A.2d 824, 827 (Pa. Cmwlth. 2001).

Marquise Inv., Inc. v. City of Pittsburgh, 11 A.3d 607, 617 (Pa. Cmwlth. 2010).

Moreover, our Supreme Court has stated:

> The anticipated increase in traffic must be of such character that it bears a *substantial* relation to the health and safety of the community. A prevision of the effect of such an increase in traffic must indicate that not only is there a likelihood but a high degree of probability that it will affect the safety and health of the community, and such prevision must be based on evidence sufficient for the purpose. Until such strong degree of probability is evidenced by legally sufficient testimony no court should act in such a way as to deprive a landowner of the otherwise legitimate use of his land.

Appeal of O'Hara, 131 A.2d 587, 596 (Pa. 1957) (emphasis in original).

When what is presented by objectors is a mere 'speculation of possible harms,' the objectors have failed to meet their burden. Marquise Inv., 11 A.3d at 617-18.

Thus, an application may be denied on traffic grounds only: (1) where there is a high probability that the proposed use will generate traffic not normally generated by the type of use; and (2) where the abnormal traffic threatens safety. Bailey v. U. Southampton Twp., 690 A.2d 1324 (Pa. Cmwlth. 1997). Proof of abnormal and hazardous traffic effects usually requires evidence in the form of traffic counts, accident records and expert evidence. In Re Brickstone Realty Corp., 789 A.2d 333 (Pa. Cmwlth. 2001). Here, Objector did not present sufficient evidence to meet its burden on this issue. Marquise Inv.

In addition, the ZHB's findings that Objector did not prove that Applicant's proposed uses would adversely impact public health, safety, and welfare, contrast this case with Hogan, Lepore & Hogan v. Pequea Township Zoning Board, 638 A.2d 364 (Pa. Cmwlth. 1994), disapproved of on other grounds by Wistuk v. Lower Mt. Bethel Township Zoning Hearing Board, 925 A.2d 768 (Pa. 2007) and Blair v. Board of Adjustment of Borough of Hatboro, 169 A.2d 49 (Pa. 1961), cited by Objector. Unlike in those cases where the fact-finders *credited* evidence that the proposed uses would adversely impact the public health, safety, and welfare, the ZHB here found that Objector did *not* prove that Applicant's proposed uses would create a high probability of an adverse, abnormal or detrimental effect to public health, safety and welfare. ZHB Op. (Drakulic Site),

F.F. No. 139; ZHB Op. (Backus Site), F.F. No. 140; ZHB Op. (Deutsch Site), F.F. No. 141; ZHB Op. (Numis Site), F.F. No. 108.

Further, as explained above, the ZHB's supported determinations reveal that Applicant satisfied Section 190-641(D) of the zoning ordinance (relating to the health, safety and welfare of the Township's citizens or any other potentially affected land owner). And, as stated above, in granting the four requested special exceptions, the ZHB attached several detailed conditions aimed at mitigating Objector's concerns over potential adverse effects, such as noise, lighting, air quality, and truck traffic, associated with Applicant's proposed uses. The ZHB also attached a condition that requires Applicant to establish and maintain a 24-hour emergency hotline telephone number to allow for reporting of any emergencies that may occur.

Nevertheless, Objector maintains the ZHB did not uphold its constitutional duty to protect the environmental rights of the Township's residents as required by Article I, Section 27 of the Pennsylvania Constitution. In support, it references our Supreme Court's decisions in Pennsylvania Environmental Defense Foundation v. Commonwealth, 161 A.3d 911 (Pa. 2017) (declaratory judgment suit brought by environmental advocacy entity, challenging constitutionality of statutory enactments relating to funds generated from leasing of state forest and park lands for oil and gas exploration and extraction) and Robinson Township v. Commonwealth, 83 A.3d 901 (Pa. 2013) (suit for declaratory and injunctive relief challenging constitutionality of Act 13 of 2012,[8] amending the Pennsylvania Oil

_____

[8] Act No. 13 of February 14, 2012, P.L. 87.

30

and Gas Act, 58 Pa. C.S. §§2301-3504).  Clearly, those cases, which involved constitutional challenges, are distinguishable in that this case does not involve a constitutional or substantive validity challenge.  Rather, this case involves applications for uses permitted by special exception, and appellate review of the ZHB's application of the zoning ordinance's special exception criteria to the facts presented.

Moreover, contrary to Objector's assertions, Applicant's proposed unconventional gas well operations are permitted by special exception in the MEO District, which evidences a legislative decision that the uses are consistent with the zoning plan and presumptively consistent with the health, safety and welfare of the community.  Greth Dev. Grp.  In light of the fact that Objector presented no credible evidence of harm, Objector's claims are unsupported by the *accepted* evidence of record.  Further, as explained above, the ZHB attached several detailed conditions to the grant of the special exceptions in order to mitigate adverse effects associated with Applicant's proposed unconventional gas drilling uses.

## IV. Conclusion

In sum, no error is apparent in the ZHB's grant of Applicant's four special exception applications for its proposed unconventional gas wells, subject to detailed conditions aimed at mitigating the adverse impacts associated with the proposed uses.  Accordingly, we affirm.

_____
ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Protect PT,                          :
                    Appellant       :
                                     :
        v.                           :    No. 39-42 C.D. 2018
                                     :
Penn Township Zoning Hearing         :
Board and Apex Energy (PA), LLC      :

## **O R D E R**

**AND NOW**, this 8th day of November, 2018, the order of the Court of Common Pleas of Westmoreland County is **AFFIRMED**.

_____
ROBERT SIMPSON, Judge