IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Appeal of:  Artisan Construction : 
Group, LLC from the Portions of the : 
Decision Dated January 31, 2024 of : 
the Board of Supervisors of East : 
Vincent Township, Chester County, : 
Pennsylvania : 
 : 
 :  No. 963 C.D. 2024
Appeal of: Artisan Construction :  Argued: February 3, 2026
Group, LLC

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE STELLA M. TSAI, Judge

OPINION
BY JUDGE TSAI                                    FILED: March 16, 2026


Artisan Construction Group, LLC (Artisan), appeals from an order of the Court of Common Pleas of Chester County (Common Pleas), which affirmed a decision of the Board of Supervisors of East Vincent Township (Board).  The Board granted conditional use approval for a 53-unit residential development (53-Unit Plan) and denied conditional use approval for an 86-unit residential development (86-Unit Plan).  We now affirm.

## I. BACKGROUND

On October 17, 2022, Artisan filed with the Board an application (Application) for conditional use approval for the 86-Unit Plan.[1]  Artisan filed the Application pursuant to Part 9 of the East Vincent Township Zoning Ordinance

---

[1] The 86-Unit Plan was tailored not only to zoning but also to preliminary plan requirements under East Vincent Township's Subdivision and Land Development Ordinance (SALDO) for a residential development to be known as "Bechtel Farm at Stony Run."

of 2002, as amended (Zoning Ordinance), pertaining to Open Space Design Option (OSDO); Part 19 of the Zoning Ordinance, pertaining to Conditional Use Process; and Part 24 of the Zoning Ordinance, pertaining to Transferable Development Rights (TDRs).

To meet density requirements, Artisan proposed to develop two adjacent properties in East Vincent Township (Township) using TDRs. One of the properties, consisting of approximately 67.9 acres, is located at 446 Stony Run Road (Development Tract) and is situated in the Low Density Residential (LR) Zoning District.[2] The other property, consisting of approximately 90 acres, is located at 1241 West Bridge Street (Sending Tract) and is situated in the Rural Conservation (RC) Zoning District. Artisan proposed utilizing the TDRs to increase the density and number of residences in the LR Zoning District. Under the Zoning Ordinance, TDRs may be used to allow additional density on a property in exchange for forfeiting an equivalent number of development rights on a property less suitable for development that is also owned by an applicant.[3] In addition, Artisan proposed to utilize the OSDO, which is authorized in the LR Zoning District as a conditional use for residential development under Section 27-902 of the Zoning Ordinance.[4]

---

[2] The Development Tract is currently improved with a dwelling, a barn, a large shed, and a spring house, and is considered a Class II Historic Resource. The current use of the Development Tract is agricultural. Board Decision ¶¶ 17-18.

[3] *See* Sections 24-204 to 24-2407 of the Zoning Ordinance.

[4] Section 27-902(1)(B) of the Zoning Ordinance provides:

Conditional Use Approval. Use of the open space design option shall be permitted in the LR and MR Districts when approved as a conditional use in accordance with the provisions of Part 19 of this chapter and where the applicant, to the satisfaction of the Board of Supervisors, can demonstrate compliance with all design standards and criteria of this Part.

2

The Board conducted eleven hearings over eleven months. Appellee East Vincent Advocacy (EVA), a group formed for the purpose of advocating on behalf of its members in favor of responsible development in the Township, and Appellee William Fields (Fields), a member of EVA who resides directly across the street from the proposed development, sought to intervene in the proceedings. The Board granted intervention, and EVA and Fields participated as parties in the hearings.[5] Throughout the course of the hearings, Artisan submitted four revisions to the 86-Unit Plan.

At the tenth hearing on October 4, 2023, Artisan presented to the Board an alternative proposal, the 53-Unit Plan, and agreed to submit the 53-Unit Plan to the Township Engineer and the Township's Planning Commission for limited review given the timing of the further hearings and the lack of fully engineered plans. According to the Board, Artisan maintained that the 53-Unit Plan did not supplant the 86-Unit Plan, that Artisan was not withdrawing the 86-Unit Plan, and that "Artisan took the position that it would accept an approval limited to the [53-Unit Plan] as a condition." Board Decision at 2; *see also* Reproduced Record (R.R.) at 2909a.

The Board orally announced its decision on November 27, 2023, denying conditional use as to the 86-Unit Plan and granting it as to the 53-Unit Plan. Artisan agreed to an extension of time for the Board to deliver a written decision, which it did on January 31, 2024.[6] In denying the conditional use for the 86-Unit Plan, the Board issued extensive factual findings establishing that Artisan failed to meet its

---

[5] When used herein, EVA includes not only EVA but its member William Fields.

[6] In that same decision, the Board granted Artisan conditional use approval for the 53-Unit Plan. Artisan did not appeal that portion of the Board's decision.

3

initial burden to prove that the 86-Unit Plan satisfied the specific, objective criteria of the Zoning Ordinance, identifying three bases for its denial. First, the Board determined that the density and use of TDRs from the Sending Tract did not allow the 86 proposed lots on the Development Tract. Second, the Board identified concerns regarding the stormwater management facilities, including the suitability of stormwater management areas, the efficacy of the facilities, and the accuracy of calculations. Finally, the Board found that Artisan failed to demonstrate evidence of adequate available sewage disposal capacity.

As to density, the Board considered the testimony of Patrick J. Stuart, R.L.A. (Stuart), an expert in landscape architecture and landscape planning, introduced by Artisan in support of the use of TDRs for the 86-Unit Plan. The Board also considered the testimony of EVA's expert in land planning, John Snook, who has 45 years of land planning experience in Chester County and was the principal author of the current Zoning Ordinance as adopted in 2002. Board Decision at 23, ¶¶ 55-56.

The Board found that Stuart testified that the Development Tract could receive 49 TDRs.[7] *Id.* at 21, ¶ 48. The Board summarized the five-step process that Stuart then utilized to argue that Artisan was entitled to use the 49 TDRs from the Sending Tract to develop a total of 86 lots on the Development Tract. *Id.* at 21, ¶ 49. The Board summarized Snook's testimony as agreeing with Stuart to the extent that Stuart calculated that the Sending Tract had 39 TDRs to send and that those TDRs converted to 49 TDRs for the Development Tract to receive. *Id.* at 23, ¶ 58. Snook also agreed with Stuart that, based on steps one and two, the "adjusted maximum

---

[7] Stuart reached this conclusion by first determining that the Sending Tract had 39 TDRs available to "send" and by then applying a multiplier of 1.25 to convert the 39 TDRs into the number of TDRs that could be sent to the Development Tract—*i.e.*, 49 TDRs. Board Decision at 21, ¶ 48.

4

permitted number of lots or dwelling units for the Development Tract [is] 53 lots."[8] *Id.* at 24, ¶ 59. Snook, however, parted ways with Stuart's calculations for the remaining three steps based on his belief that Stuart incorrectly interpreted the Zoning Ordinance. *Id.* at 24, ¶ 60.

As to step three, the Board found that Stuart purported to show the "Increased Density" for the Development Tract under the OSDO pursuant to Section 27-904.1 of the Zoning Ordinance, relating to Minimum Restricted Open Space, which provides that the Minimum Restricted Open Space for an OSDO development in the LR Zoning District is 50%. *Id.* at 22, ¶ 52. According to the Board, "Stuart then assert[ed] that because the Development Tract 'has,' with the receipt of TDRs, 86 lots and the base maximum permissible number of lots or dwelling units for the Development Tract is 41, that the Development Tract has demonstrated a 100% increase in permitted density."[9] *Id.*

---

[8] The first two steps of Stuart's five-step process, as summarized by the Board, addressed initial calculations relating to maximum density. In step one, Stuart calculated the "Maximum Base Lot Density" for the Development Tract under the OSDO pursuant to the Area and Bulk Regulations set forth in Section 27-904.2 of the Zoning Ordinance; specifically, he multiplied the net tract area for the Development Tract (58.653 acres) by the multiplier designated for the LR Zoning District (0.70) to arrive at the maximum permissible number of lots or dwelling units for the Development Tract—41. Board Decision at 21, ¶ 50. In step two, Stuart calculated the "Maximum TDR Receiving Lot Density" for the Development Tract under the OSDO where the TDRs are utilized pursuant to Section 27-2404.1(B)(1) of the Zoning Ordinance, relating to Conventional Residential TDR Transfer. *Id.* at 21, ¶ 51. Stuart explained that Section 27-2404.1(B)(1)(a)(1) increases the multiplier used in step one to calculate the maximum permissible number of lots of dwelling units from 0.70 to 0.90, resulting in an adjusted maximum permissible number of lots or dwelling units for the Development Tract of 53. *Id.* at 21-22, ¶ 51.

[9] It appears that the increase in density in this LR District—which we emphasize is a *Low Density* Residential Zoning District—is actually 110% under Stuart's process—not 100%. Subtracting 41 permissible lots from 86 planned lots yields an increase of 45 lots. Dividing the additional 45 lots by the original 41 permissible lots for purposes of determining a percentage increase in density results in a density increase of 110% ($45 \div 41 = 1.097$, rounded up to 1.10 or 110%).

As to step four, the Board found that Stuart calculated the "Required Open Space for the Development Tract" under the OSDO pursuant to Section 27-2404.1(B)(1)(d), pertaining to Minimum Required Open Space, which the Board described as providing that "for each 10% increase in gross density over the base density permitted, the minimum open space requirement under the OSDO may be reduced by 2.5%; but, not below 25% of the gross tract area." *Id.* at 22, ¶ 53. Stuart, relying on his calculation in step three, asserted that, "because the Development Tract has demonstrated a 100% increase in permitted density (or, 10 instances of [a] 10% increase in gross density), it can reduce its required minimum open space (50%) by 25% (10 increases of 10% multiplied by 2.5%)." (*Id.*) Stuart then argued that, "because Artisan proposes to reserve 56.89% of the Development Tract as open space where only 25% is required, . . . Artisan has reserved an excess of 31.89% of the Development Tract as open space." *Id.*

As to Stuart's final step—step five—the Board found that Stuart purported to show under Section 27-904.3 of the Zoning Ordinance, pertaining to "Bonus Density for Open Space Conservation," that Artisan is entitled to 34 bonus lots, which, when added to the 53 maximum lots previously calculated in step two, results in a total of 87 lots permitted. *Id.* at 23, ¶ 54. Section 27-904.3, as explained by the Board, provides that "where TDRs are received, for each percentage point of open space reserved in excess of the minimum amount required, the maximum number of units may be increased by 2%." *Id.* Stuart asserted that "because Artisan has reserved an excess of 31.89% of the Development Tract as open space, when that is multiplied by 2%, it results in Artisan being entitled to a bonus density of 63.78%, which, multiplied by 53 as the maximum permissible number of lots for the Development Tract, results in 34 bonus lots for a total of 87 lots permitted." *Id.*

6

When considering Snook's testimony as to step three, the Board found that Stuart improperly used the "total number of lots or dwelling units Artisan had accumulated for the Development Tract after receiving TDRs as a measure of increased density." *Id.* at 24, ¶ 60. Snook opined that no upward "adjustments in permitted density may be made based upon the number of TDRs a property has received [over] the base maximum permitted number of lots pursuant to the OSDO." *Id.* The Board focused on Snook's explanation that "the calculation of TDRs received refers to 'a number of available received rights due to TDRs, as opposed to due to the base density of the land.'" *Id.* at 24, ¶ 61 (quoting Notes of Testimony (N.T.), 07/19/2023, at 17-18). Importantly, the Board found that "Stuart acknowledged that he could not identify where the Zoning Ordinance permitted the allowed increase in density to be calculated by comparing the number of units permitted on a property after the receipt of TDRs with the base number of units permitted on a property pursuant to the OSDO." *Id.* at 24, ¶ 62.

As to step four, the Board found that Snook testified that the minimum restricted open space shall not be less than 50% in the LR Zoning District. *Id.* at 25, ¶ 64. He further testified that "to be eligible for calculation of bonus density, open space must comprise open space area(s) fully in addition to the minimum required in the LR [Zoning] District," and he opined that Stuart's methodology was contrary to the unambiguous language of the Zoning Ordinance and inconsistent with the ordinance's purpose of promoting conservation. *Id.* at 25, ¶¶ 64-65. Stuart's analysis, according to Snook, relied on a false assumption in step three that Artisan qualified for a 100% density increase and improperly allowed a reduction of open space below 50%. *Id.* at 24, ¶ 63.

7

Finally, as to Stuart's step five, the Board found that Snook testified that the purpose of Part 9 pertaining to the OSDO is to permit applicants who are entitled to extra density some additional flexibility in placing homes, but it does not reduce the required 50% open space minimum threshold. *Id.* at 25, ¶ 67. Snook opined that correct application of the Zoning Ordinance would require Artisan to calculate "Bonus Density for Open Space Conservation" by subtracting the minimum open space required (50%) from the open space preserved (56.89%) to determine the amount of eligible restricted open space for the calculation of the number of bonus lots available (6.89%). *Id.* at 26, ¶ 68. For each of those percentage points, Artisan would be eligible for a 2% increase in the maximum number of units for a total of seven bonus lots for a grand total of 60 lots permitted on the Development Tract. *Id.*

Ultimately, as to the maximum density and open space calculations, the Board found that the testimony and opinions of Stuart, Artisan's expert, were not credible. Instead, it relied on the testimony of Snook, EVA's expert, to conclude that Artisan failed to meet the requirements of the Zoning Ordinance.

As to stormwater management, the Board found that Michelle Adams, P.E. (Adams), EVA's expert in civil engineering with specialties in water resources and stormwater management, testified to deficiencies in the stormwater management plan. Board Decision at 28, ¶¶ 83-85. Specifically, the Board found that Adams testified that the type of soils on the southwestern part of the site are hydric soils that occasionally ponded, making the area not suitable for stormwater management; she also raised questions as to the efficacy of the stormwater management facilities as proposed and the accuracy of Artisan's stormwater calculations. *Id.* at 28-29, ¶¶ 88-89, 92.

8

As to the sewage capacity, the Board found that Artisan failed to establish adequate capacity because the 86-Unit Plan's provision for public sanitary sewer was entirely reliant on a proposed expansion of the Veteran's Center Waste Water Treatment Plant, which is a condition of the Township's approval of a wholly unrelated development known as "Jones Motor." *Id*. at 29, ¶ 94. The Jones Motor development is separate and distinct from this matter; nonetheless, Artisan claimed its development would have public sewer access by way of the Jones Motor agreement. *Id.* at 29, ¶ 95. The Board found no credible evidence of record to support that claim. *Id.* at 30, ¶ 96.

Artisan appealed the denial to Common Pleas, which affirmed the Board by opinion and order, dated July 18, 2024.

## II. ISSUES

On appeal,[10] Artisan generally argues that the Board erred as a matter of law or abused its discretion in denying conditional use approval of the 86-Unit Plan. In support thereof, Artisan maintains that it demonstrated compliance with the Township's conditional use requirements relating to density through the use of

---

[10] Where a court has not held a hearing or taken additional evidence, the standard of review in a land use appeal is limited to a determination of whether the municipal body has committed an error of law or a manifest abuse of its discretion. *Allegheny W. Civic Council Inc. v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 689 A.2d 225, 227 (Pa. 1997). Abuse of discretion is found if the board's findings are not supported by substantial evidence. *Valley View Civic Ass'n v. Zoning Bd. of Adjustment*, 462 A.2d 637, 640 (Pa. 1983). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Where an error of law is claimed, the standard of review is de novo. *Pocono Manor Investors, L.P. v. Pa. Gaming Control Bd.*, 927 A.2d 209, 216 (Pa. 2007). Moreover, the trial court cannot substitute its interpretation of the evidence for that of the board. *Taliaferro v. Darby Twp. Zoning Hearing Bd.*, 873 A.2d 807, 811 (Pa. Cmwlth.), *appeal denied*, 887 A.2d 1243 (Pa. 2005). When the record contains substantial evidence, the court is bound by a "board's findings that result from resolutions of credibility and conflicting evidence rather than a capricious disregard of evidence." *Id.* On review, the board's interpretation and application of its zoning ordinance is entitled to considerable deference. *Caln Nether Co., L.P, v. Bd. of Supervisors of Thornbury Twp.*, 840 A.2d 484, 491(Pa. Cmwlth.), *appeal denied*, 856 A.2d 835 (Pa. 2004).

9

TDRs and the OSDO and that the Board erred in failing to read Zoning Ordinance provisions *in pari materia*. Artisan contends that it provided evidence of compliance with stormwater management requirements and that the Township's testimony on stormwater was deficient. Artisan also contends that it demonstrated the ability to comply with requirements for public sewage facilities and that the alleged ability to comply with requirements for sewer capacity was for factors within the Township's control.

The Board and EVA submit counter-statements of these questions presented. The Board counters that it did not abuse its discretion by denying the conditional use for the 86-Unit Plan; it disputes that the applicable portion of the Zoning Ordinance is ambiguous; and it argues that it applied the proper standard of review, such that the Board's decision should be affirmed. EVA joins the Board's brief and further counters that we should affirm because the Board appropriately exercised its discretion to deny conditional use for the 86-Unit Plan because Artisan failed to show that its plan satisfied the specific, objective criteria of the Zoning Ordinance. Additionally, EVA advances three alternative arguments, all of which depend on its assertion that Artisan, in a hearing before the Board, entered into a settlement agreement with EVA through which Artisan agreed to reduce its proposed subdivision from 86 lots to 53 lots, handle all sewage with on-lot systems, and address all stormwater issues raised by EVA's expert. As a result of that settlement agreement, EVA contends that the Board's decision should be affirmed or Artisan's appeal barred based upon (1) the doctrine of equitable estoppel, (2) the doctrine of judicial estoppel, or (3) judicial admissions.

### III. DISCUSSION

"A conditional use is nothing more than a special exception, which falls within the jurisdiction of the municipal governing body rather than the zoning hearing board." *Williams Holding Grp., LLC v. Bd. of Supervisors of W. Hanover Twp.*, 101 A.3d 1202, 1212 (Pa. Cmwlth. 2014). Despite its name, a conditional use, like a special exception, is not an exception to the municipality's zoning ordinance; instead, it is a right to which an applicant is entitled "unless the governing body determines that the use does not satisfy the specific, objective criteria in the zoning ordinance for that conditional use." *In re: Drumore Crossings, L.P.*, 984 A.2d 589, 595 (Pa. Cmwlth. 2009), *appeal denied*, 4 A.3d 1054 (Pa. 2010). A "conditional use" is a "use permitted in a particular zoning district pursuant to the provisions in Article VI" of the Pennsylvania Municipalities Planning Code (MPC),[11] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10601-10621. *See* Section 107(a) of the MPC, 53 P.S. § 10107(a). A governing body has authority to grant a conditional use "pursuant to express standards and criteria set forth in the zoning ordinance." Section 603(c)(2) of the MPC, 53 P.S. § 10603(c)(2).

A conditional use "evidences a legislative decision that the particular type of use is consistent with the zoning plan and presumptively consistent with health, safety[,] and welfare of the community." *In re Cutler Grp., Inc.*, 880 A.2d 39, 42 (Pa. Cmwlth. 2005), *appeal denied*, 897 A.2d 461 (Pa. 2006). Put another way, it is a "legislative determination that such use would not have an adverse impact on the public interests in normal circumstances." *Joseph v. N. Whitehall Twp. Bd. of Supervisors*, 16 A.3d 1209, 1215 (Pa. Cmwlth. 2011). The applicant bears the burden of establishing that "the proposed conditional use satisfies the objective

---

[11] The MPC is set forth in its entirety at 53 P.S. §§ 101-11202.

11

standards set forth in the zoning ordinance." *Drumore Crossings*, 984 A.2d at 595. The burden then "shifts to [the] objectors to rebut the presumption by proving that there is a high degree of probability the proposed use will adversely affect the welfare of the community in a way not normally expected from the type of use." *Brookview Solar I, LLC v. Mount Joy Twp. Bd. of Supervisors*, 305 A.3d 1222, 1233 (Pa. Cmwlth. 2023) (quoting *H. E. Rohrer, Inc. v. Zoning Hearing Bd. of Jackson Twp.*, 508 A.2d 1014, 1018 (Pa. Cmwlth. 2002)). "'Mere speculation' of possible harm is not sufficient, and the objectors' burden may not be satisfied with personal opinion or bald assertions." *Brookview Solar I*, 305 A.3d at 1233. A "conditional use application must be granted unless the objectors present sufficient evidence that the proposed use has a detrimental effect on the public health, safety[,] and welfare." *In re McGlynn*, 974 A.2d 525, 537 (Pa. Cmwlth. 2009).

The primary objective of interpreting ordinances is to determine the intent of the enacting body, and the plain language of an ordinance provides the most reliable indication of that intent. *Kohl v. New Sewickley Twp. Zoning Hearing Bd.*, 108 A.3d 961, 968 (Pa. Cmwlth. 2015). "Where the words in an ordinance are free from all ambiguity, the letter of the ordinance may not be disregarded under the pretext of pursuing its spirit [and] [a]n ambiguity [can only] exist[] when language is subject to two or more reasonable interpretations . . . ." *Adams Outdoor Advert., LP v. Zoning Hearing Bd. of Smithfield Twp.*, 909 A.2d 469, 483 (Pa. Cmwlth. 2006) (citations omitted), *appeal denied*, 923 A.2d 1175 (Pa. 2007).

### A. Settlement Agreement

Before we address whether Artisan met the requirements for conditional use, we will address EVA's assertion that Artisan's appeal is barred by a settlement between EVA and Artisan. EVA asserts that Artisan entered into a settlement on

the record that it would reduce the density of the 86-Unit Plan to 53 units and seek approval of the 53-Unit Plan which would not use public sewers and would address all issues raised by EVA's stormwater expert in exchange for EVA's agreement to withdraw its opposition to Artisan's proposed conditional use application. EVA, however, also acknowledges that Artisan did not withdraw its 86-Unit Plan, but it contends that Artisan did so because it wanted to preserve its right to appeal in the event that the Board denied both plans. EVA maintains that it performed its obligations under the agreement, withdrew its opposition to the Application as revised, and supported the 53-Unit Plan, which resulted in Artisan receiving approval for the conditional use based on the 53-Unit Plan. EVA focuses on a statement at the hearing by Artisan's principal, John Benson (Benson), that the 53-Unit Plan is a plan Artisan would "accept as a condition of conditional use approval if the Board desires to add such condition." R.R. at 2903a, 2909a. EVA contends that the agreement was memorialized under oath and on the record.

A review of the record reveals that, in housekeeping matters before testimony was taken at the October 4, 2023 public hearing before the Board, counsel for EVA stated that Artisan proposed to "reduce the density down to a maximum of 53 units," eliminate public sewers in favor of on-lot sewers for all units, make traffic improvements, and "satisfy [EVA's] concerns about the stormwater." R.R. at 2903a. EVA's counsel then noted that the agreement "of course needs to be flushed out a little bit." *Id.* Counsel for the Township's Planning Commission was quick to point out that counsel could not agree to anything on the Township's behalf and that the developer must present the revised plan through the proper channels. R.R. at 2904a-2905a. Benson then testified under oath that the submission of the 53-Unit Plan does not mean that he is withdrawing the 86-Unit Plan, but that this plan was evidence

13

that an alternative exists that could meet the residents' concerns. R.R. at 2908a-2909a. When asked, as a hypothetical, if he would accept this 53-Unit Plan as a condition of conditional use approval if the Board desired to accept it, Benson said yes. R.R. at 2909a. The record does not reflect any formal Board action with respect to this potential offer. EVA offered no other evidence of the agreement. Based on this evidence, we cannot agree with EVA's characterization that an agreement exists, let alone that the agreement would serve to bar Artisan's appeal under any of the bases asserted by EVA. Thus, we now turn to the merits of Artisan's appeal.

## B. Compliance with Objective Requirements

As discussed above, Artisan argues that the Board erred in denying conditional use approval based on what the Board found to be deficiencies relating to density, stormwater management, and sewage capacity. Nevertheless, Artisan devotes a large portion of its brief to addressing how it demonstrated compliance with the permissible zoning standards. This argument does not identify errors or abuses of discretion by the Board; rather, it essentially asks the Court to view the evidence in a light most favorable to Artisan and find that Artisan met the standards. "Our role is not to reweigh the evidence or determine the credibility of witnesses, but to determine whether, upon consideration of the evidence as a whole, the [Board's] findings have the requisite measure of support in the record." *Lodge v. Robinson Twp. Zoning Hearing Bd.*, 283 A.3d 910, 925 (Pa. Cmwlth. 2022). As part of that argument, Artisan, as if in passing, contends that it met the *permissible* zoning standards, suggesting that the Township's standards for conditional use impermissibly exceed MPC requirements because they required Artisan to attach a preliminary or final plan and technical standards. Artisan appears to be referencing

14

the requirement of Section 27-1901.4(B) of the Zoning Ordinance[12] that an application for conditional use "be accompanied by a unified overall site plan covering the entire tract." Artisan, however, acknowledges that Section 27-1901.4(B) provides, in part, that "such plan need not meet formal submission requirements under the Subdivision and Land Development Ordinance, but shall be prepared with sufficient detail to adequately illustrate the proposed development uses and non-development uses." Artisan's Brief at 26. Artisan fails to explain how such requirement is impermissible, other than to baldly assert that "the requirements are overly exacting for a zoning approval." *Id.* at 27. It also fails to explain how the Board's denial relates to Artisan's complaints about impermissible standards. For those reasons, we are unpersuaded that Artisan's attempt to show compliance with permissible standards demonstrates any error or abuse of discretion on the part of the Board. With that said, we now turn to Artisan's actual challenges to the Board's decision.

---

[12] Section 27-1901.4(B) of the Zoning Ordinance provides:

Development Plan. Any application for conditional use approval involving subdivision or land development, ultimately subject to submission and approval in accordance with the East Vincent Subdivision and Land Development Ordinance [Chapter 22], shall be accompanied by a unified, overall site plan covering the entire tract, regardless of any intended phasing of development, prepared at a graphic scale of at least one inch equals 100 feet. For the purposes of application for conditional use approval, such plan need not meet formal submission requirements under the Subdivision and Land Development Ordinance [Chapter 22], but shall be prepared with sufficient detail to adequately illustrate the proposed development uses and non-development uses of the tract, including (where appropriate), reserve areas for possible future expansion; coordinated internal and external vehicular and pedestrian circulation; well related, convenient and efficient parking and loading areas; agreeable surroundings that provide comfort, safety, and convenience for prospective residents, customers, and/or workers; and high quality design in terms of building relationship, facade treatment, signage, lighting, landscaped and planted buffers and screens, as well as other natural and constructed amenities in furtherance of the comprehensive planning objectives of East Vincent Township.

15

## C. Density

Artisan, in an attempt to explain why its density calculations are correct despite the lack of readily identifiable support in the Zoning Ordinance, asserts that the provisions of Part 9 and Part 24 of the Zoning Ordinance, relating to the OSDO and TDRs, respectively, must be read *in pari materia* under Section 1932 of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa. C.S. § 1932. Artisan emphasizes that both Parts address the same subject matter and reference each other, such that they should be read together. Artisan then directs our attention to Sections 27-904.2 and 27-904.3 of the Zoning Ordinance, which it uses to calculate bonus density for the OSDO, and Section 27-2404.1(B)(1)(d), which it uses to calculate the minimum required open space. Artisan appears to contend that the two sections, read together, support the calculations advanced by Stuart on behalf of Artisan for the 86-Unit Plan.

The Board represents that it did not commit an error of law or an abuse of discretion; rather, Artisan did not establish that it met the applicable objective criteria of the Zoning Ordinance because the testimony of Stuart as to maximum density was dependent on a misapplication of the Zoning Ordinance. Specifically, Stuart utilized a "phantom" step—step three—in his calculation of maximum density, which had no basis in the Zoning Ordinance and undermined steps four and five of his calculation. In further support of its position, the Board urges the Court to defer to its interpretation of the Zoning Ordinance as the governing body. The Board rejects any notion that the Zoning Ordinance is ambiguous and submits that the rule regarding interpretation of an ordinance in favor of a landowner contained

16

in Section 603.1 of the MPC[13] only applies when the words of the ordinance are not free and clear from ambiguity.

In *Williams Holding Group*, we explained the interplay between the deference we afford a governing body's interpretation of an ordinance and the favorable interpretation we are to extend to an applicant under Section 603.1 of the MPC. We wrote:

> [T]he common rule [is] that appellate courts reviewing a governing body's adjudication of a conditional use application generally should defer to the interpretation rendered by the governing body. *See Smith v. Zoning Hearing Bd.*, 734 A.2d 55, 57 (Pa. Cmwlth.), *appeal denied*, . . . 747 A.2d 904 ([Pa.] 1999). "[A]s the entity charged with administering a zoning ordinance," the governing body possesses knowledge and expertise regarding the ordinance. *Id.* at 58. This rule must sometimes bend to the second rule, found in Section 603.1 of the MPC, which provides:
>
> > [i]n interpreting the language of the zoning ordinance to determine the extent of the restriction upon . . . the use of the property, the language shall be interpreted, where doubt exists as to the intended meaning of the language written and enacted by the governing body, in favor of the property owner and against any implied extension of the restriction.
>
> We have held that we must "interpret ambiguous language in an ordinance in favor of the property owner and against any implied extension of the restriction." *Isaacs v. Wilkes-Barre City Zoning Hearing Bd.*, . . . 612 A.2d 559, 561 ([Pa. Cmwlth.] 1992). Thus, the general rule contained in Section 603.1 of the MPC applies only when the words of an ordinance are not free and clear from ambiguity. *Id.*

*Williams Holding Group*, 101 A.3d at 1213.

While deference to the governing body and Section 603.1 of the MPC have potential implications for our analysis, we are also guided by the Statutory

---

[13] Added by the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10603.1.

Construction Act.[14]  Section 1932 of the Statutory Construction Act provides that "[s]tatutes or parts of statutes are *in pari materia* when they relate to the same persons or things or to the same class of persons or things" and that "[s]tatutes *in pari materia* shall be construed together, if possible, as one statute."  1 Pa. C.S. § 1932.  Our Supreme Court has explained:

> A fundamental principle in statutory construction is that we must read statutory sections harmoniously. Parts of a statute that are *in pari materia*, *i.e.*, statutory sections that relate to the same persons or things or the same class of persons and things, are to be construed together, if possible, as one statute.  "If they can be made to stand together[,] effect should be given to both as far as possible."  In ascertaining legislative intent, statutory language is to be interpreted in context, with every statutory section read "together and in conjunction" with the remaining statutory language, "and construed with reference to the entire statute" as a whole. We must presume that in drafting the statute, the General Assembly intended the entire statute, including all of its provisions, to be effective.  Importantly, this presumption requires that statutory sections are not to be construed in such a way that one section operates to nullify, exclude[,] or cancel another, unless the statute expressly says so.

*Trust Under Agreement of Taylor*, 164 A.3d 1147, 1157 (Pa. 2017) (internal citations omitted).  With this in mind, we now turn to the Zoning Ordinance provisions at issue.

Section 27-904 of the Zoning Ordinance provides, in part:

1.  Minimum Restricted Open Space.  The minimum restricted open space shall not be less than the following percentage of the gross acreage of the tract, as stipulated for the appropriate zoning district . . . .

    A.  Zoning District Minimum Restricted Open Space.

        (1) LR District: 50%.

        . . . .

---

[14] 1 Pa. C.S. §§ 1501-1991.

2. Permitted Density Calculation. Except where bonus density is permitted in accordance with the provisions of Subsection 3, the maximum permissible number of lots or dwelling units on any tract utilizing the open space design option shall be calculated by multiplying the net tract area (in acres) by the multiplier stipulated for each zoning district. . . . The product of any such calculation may be rounded to the nearest whole number[.]

. . . .

*Applicant is advised that the maximum number of units calculated under the provisions herein, including potential bonus density, may not always be achievable while meeting requirements for minimum restricted open space and all other standards, criteria, and regulations herein. . . .*

3. Bonus Density for Open Space Resource Conservation. In order to promote conservation of significant open space resources, the maximum density or number of lots or dwelling units permitted on any tract of land proposed for development under the open space design option may be increased over and above the base maximum calculated as above or over and above the adjusted maximum in cases where transferable development rights (TDRs) are received, where open space is provided meeting the criteria established in Paragraphs A to D, below, as follows: for each percentage point of eligible open space, calculated as a percentage of gross tract area, the maximum number of units may be increased by 2%. This density bonus shall be calculated as a percentage of the maximum number of units originally calculated under Subsection 2 or as adjusted in cases of receipt of TDRs.

A. In order to be eligible for calculation of bonus density, *open space must comprise open space area(s) fully in addition to the minimum required restricted open space area*, established in accordance with Subsection 1 above.

. . . .

C. Open space eligible for calculation of bonus density must comprise one or more of the following resource categories:

(1) Prime agricultural land, as defined by the Municipalities Planning Code, and as further listed in § 27-401A of this chapter, as Class I, II, and III soils of East Vincent Township.

. . . .

(Emphasis added.)

Section 27-2404.1 of the Zoning Ordinance provides, in part, that owners of tracts meeting the requirements of the section "may use development rights that are purchased from sending area landowners," as follows:

> A. Receiving Area Qualifications. The receiving tract of land shall be located in the LR . . . Zoning District[]. Density and/or intensity of development on receiving tracts may be increased through the use of TDRs where approved as a conditional use in accordance with the provisions of Paragraph B., below, as applicable.
>
> B. Provision for Transfer of Development in Receiving Areas.
>
>> (1) Conventional Residential TDR Transfer.
>>
>>> (a) Increase in Permitted Density. Under the open space design option (OSDO), subject to conditional use approval, the density multipliers stipulated in § 27-904.2 may be increased through receipt of transferred development rights as follows:
>>>
>>>> (1) In the LR District, the multiplier may be increased to 0.9.
>>>>
>>>> . . . .
>>>
>>> (c) Calculation of Received Development Rights. The incremental increase in density above that provided for in the base zoning district must be fully accounted for through proof of purchase and transfer of development rights in accordance with the provisions of this Part. . . .
>>> . . . .
>>>
>>> *The ratios for conversion of sending rights to received rights shall not affect the maximum incremental density increase through use of TDRs stipulated in Subsection B.(1)(a), above.*
>>>
>>> (d) Minimum Required Open Space. For each 10% increase in gross density over the base density permitted under the open space design option (OSDO), the applicable minimum open space requirement under the OSDO may be reduced 2.5%, measured as a percentage of

20

gross tract area. In no case shall the minimum required open space be reduced below 25% of gross tract area.

(Emphasis added.)

Here, the parties agree that the applicable standard multiplier for the Development Tract under Section 27-904.2 of the Zoning Ordinance is 0.7, and, because Artisan intends to transfer development rights to the Development Tract, Section 27-2404.1(B)(1)(a)(1) of the Zoning Ordinance increases that multiplier to 0.9. The dispute among the parties has its genesis in Stuart's application of Section 27-904.3 of the Zoning Ordinance, which allows an applicant to increase the maximum number of units by 2% for "each percentage of eligible open space."[15] Artisan, through Stuart's calculations, ignores the limiting language set forth in Section 27-904.2, which makes clear that the development must still comply with all other applicable provisions of the Zoning Ordinance and explicitly cautions that "the maximum number of residential units calculated . . . , including bonus density, may not always be achievable while meeting requirements for minimum restricted open space and all other standards, criteria, and regulations herein." Zoning Ordinance § 27-904.2. Applying the plain meaning of that language, it is clear that the maximum number of units that may be calculated under the Zoning Ordinance provisions are not guaranteed and may be subject to limitation by another provision of the Zoning Ordinance. Section 27-2404.1(B)(1)(c) of the Zoning Ordinance effectuates the potential limitation in this instance, because it restricts the maximum density by providing that "[t]he ratios for conversion of sending rights to received

---

[15] The "eligible open space" is limited to four categories of open space, including prime agricultural land. Zoning Ordinance § 27-904.3(C)(1). The parties do not dispute that the Sending Tract includes prime agricultural land, such that Section 27-904.3 of the Zoning Ordinance may be utilized to increase the maximum number of units.

21

rights shall not affect the maximum incremental density increase through use of TDRs."

Ironically, Artisan's argument that the relevant provisions of the Zoning Ordinance must be read *in pari materia* in the manner championed by Stuart would result in this Court failing to give effect to the limiting language identified above. Moreover, it would require us to add language to the Zoning Ordinance that does not exist, which is evidenced by Stuart's inability to identify the language of the Zoning Ordinance that authorizes step three of his five-step calculation. To the contrary, Snook's interpretation of the Zoning Ordinance and calculations align with the plain language of the Zoning Ordinance and would give effect to all provisions of the Zoning Ordinance, thereby allowing the provisions of the Zoning Ordinance to be read *in pari materia*.

Applying the provisions at issue, we agree with the Board that Section 27-2404.1(B)(1)(a)(1) of the Zoning Ordinance explicitly addresses the maximum number of residential units for the Development Tract by multiplying the net tract area by 0.9. Section 27-2404.1(B)(1)(d) of the Zoning Ordinance only provides for the reduction of the minimum required open space. It does not increase or otherwise adjust the calculation for maximum density. Artisan's strained interpretation of Section 27-2404.1(B)(1)(a)(1) to provide a basis to further increase the maximum density of the Development Tract disregards the explicit text of Section 27-2404.1(B)(1)(a)(1), adds words to Section 27-2404.1(B)(1)(d), and effectively nullifies Section 27-2404.1(B)(1)(a)(1) and other relevant provisions relating to how maximum density is calculated. Thus, we conclude that Artisan did not establish that the Board committed an error of law or abused its discretion when it determined

22

that the 86-Unit Plan did not meet the density requirements of the Zoning Ordinance.[16]

## IV. CONCLUSION

For the reasons set forth above, we affirm the order of Common Pleas, affirming the order of the Board.

_____
STELLA M. TSAI, Judge

---

[16] Because we conclude that the Board did not err or abuse its discretion in denying Artisan's conditional use Application based on density, we need not address whether the Board erred or abused its discretion in denying the Application for reasons relating to stormwater management and sewage capacity concerns.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Appeal of: Artisan Construction
Group, LLC from the Portions of the
Decision Dated January 31, 2024 of
the Board of Supervisors of East
Vincent Township, Chester County,
Pennsylvania

Appeal of: Artisan Construction
Group, LLC

:
:
:
:
:
:
:
:
:
:   No. 963 C.D. 2024

**O R D E R**

AND NOW, this 16th day of March, 2026, the order of the Court of Common Pleas of Chester County is AFFIRMED.

_____
STELLA M. TSAI, Judge